UNITED PLAINSMEN ASSOCIATION, a
Non-Profit Corporation et al., Plaintiffs
and Appellants,

v.

NORTH DAKOTA STATE WATER CON-
SERVATION COMMISSION, and Ver-
non Fahy, State Engineer, Defendants
and Appellees.

Civ. No. 9234.

Supreme Court of North Dakota.

Nov. 19, 1976.

Jos. A. Vogel, Jr., Mandan, for appellants.

Murray G. Sagsveen, Sp. Asst. Atty. Gen., Bismarck, for appellees.

PEDERSON, Justice.

This is an appeal by the United Plainsmen Association, a North Dakota non-profit corporation, from a decision of the district court of Burleigh County dismissing the complaint for failure to state a claim upon which relief could be granted.

The complaint sought an injunction against the North Dakota State Water Conservation Commission and Vernon Fahy, State Engineer. Should this court find that the trial court erred, then United Plainsmen asks for a temporary restraining order against the Commission and the State Engineer pending trial on the merits. We hold that the district court did err in dismissing the complaint, we deny a temporary restraining order, and remand the case for further proceedings.

The first question is whether an order to dismiss is appealable. In *Chas. F. Ellis Agency, Inc. v. Berg,* 214 N.W.2d 507, 509 (N.D.1974), we said:

> "The right to appeal is purely statutory * * * and an order is appealable only when it comes within the provisions of § 28–27–02, N.D.C.C."

Section 28–27–02, NDCC, defines orders which are reviewable, and states in part:

"The following orders when made by the court may be carried to the supreme court:

\*     \*     \*     \*     \*     \*

"3. An order which grants, refuses, continues, or modifies a provisional remedy, or grants, refuses, modifies, or dissolves an injunction or refuses to modify or dissolve an injunction, whether such injunction was issued in an action or special proceeding or pursuant to the provisions of section 35–22–04, or which sets aside or dismisses a writ of attachment for irregularity;"

We note that the order appealed from was entered in accordance with a memorandum decision. In *Nord v. Koppang,* 131 N.W.2d 617, 618 (N.D.1964), we stated:

"We point out that memorandum decisions of trial courts are not appealable. Orders entered upon such decisions are appealable if they come within the statutory definition of appealable orders."

United Plainsmen argues that the order appealed from does come within the statutory definition of an appealable order. We agree with appellants that an order of dismissal with prejudice of a complaint which prays for an injunction is an effective refusal to grant an injunction and is an appealable order under subsection 3 of Section 28–27–02, NDCC. We thus proceed to the merits of United Plainsmen's appeal.

▆ On appeal from an order dismissing a complaint which prays for an injunction, the Supreme Court will pass only on the sufficiency of the complaint and not on the question of whether there might be adequate proof to support it. The rule for determining the sufficiency of the complaint was stated in *Newman v. Hjelle,* 133 N.W.2d 549, 555 (N.D.1965):

"The complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. \* \* \*

"\* \* \* The allegations must be viewed in a light most favorable to the plaintiff, admitting and accepting as true all facts well pleaded."

The injunction sought by United Plainsmen would have prevented the State Engineer from issuing future water permits for coal-related power and energy production facilities until there is a comprehensive short- and long-term plan for the conservation and development of the State's natural resources, which, United Plainsmen contends, is required by § 61–01–26, NDCC, and the common law Public Trust Doctrine existing in this State. Section 61–01–26 reads as follows:

"In view of legislative findings and determination of the ever-increasing demand and anticipated future need for water in North Dakota for every beneficial purpose and use, it is hereby declared to be the water resources policy of the state that:

"1. The public health, safety and general welfare, including without limitation, enhancement of opportunities for social and economic growth and expansion, of all of the people of the state, depend in large measure upon the optimum protection, management and wise utilization of all of the water and related land resources of the state;

"2. Well-being of all of the people of the state shall be the overriding determinant in considering the best use, or combination of uses, of water and related land resources;

"3. Storage of the maximum water supplies shall be provided wherever and whenever deemed feasible and practicable;

"4. Accruing benefits from these resources can best be achieved for the people of the state through the development, execution and periodic updating of comprehensive, coordinated and well-balanced short- and long-term plans and programs for the conservation and development of such resources by the departments and agencies of the state having responsibilities therefor;

"5. Adequate implementation of such plans and programs shall be provided by the state through cost-sharing and cooperative participation with the appropriate federal and state departments and agencies and political subdivisions within the limitation of budgetary requirements and administrative capabilities;

"6. Required assurances of state cooperation and for meeting nonfederal repayment obligations of the state in connection with federal-assisted state projects shall be provided by the appropriate state department or agency;

"7. Required assurances of local cooperation and for meeting nonfederal repayment obligations of local interests in connection with federal-assisted local projects may, at the request of political subdivisions or other local interests be provided by the appropriate state department or agency, provided, if for any reason it is deemed necessary by any department or agency of the state to expend state funds in order to fulfill any obligation of a political subdivision or other local interests in connection with the construction, operation or maintenance of any such project, the state shall have and may enforce a claim against the political subdivision or other local interests for such expenditures.

"The provisions of this chapter shall not be construed to in any manner limit, impair or abrogate the rights, powers, duties or functions of any department or agency of the state having jurisdiction or responsibilities in the field of water and related land resources conservation, development or utilization."

■ United Plainsmen argues that the language of subsection 4 of that statute imposes mandatory planning responsibility upon the State Engineer, which constitutes a condition precedent to the issuance of temporary or permanent water permits in this State. We do not agree. In the light of the qualifying proviso at the end of § 61–01–26, we must conclude that subsection 4

thereof is "hortatory and precatory, but not mandatory." See *Dathe v. Wildrose School District No. 91*, 217 N.W.2d 781, 782 (N.D. 1974).

■ Although it is not mandatory, § 61–01–26, entitled "Declaration of state water resources policy," is a significant advisory policy statement. The last sentence therein clearly indicates that it is not to be construed to limit, impair or abrogate the rights, powers, duties or functions of any department or agency of the State. This statute provides but little support for United Plainsmen's contention that the State Engineer must complete short- and long-term planning as a condition precedent to the issuance of water permits.

We note, also, that the Legislature has reserved to itself the task of research in the areas of natural resources use and the determination of governmental responsibility for the results or impacts from developments, and to assure that "there shall not be material detrimental deterioration of the environment or quality of life in North Dakota." See Section 4 of Chapter 4, Session Laws of 1975.

The foregoing, however, does not relieve the Commission and State Engineer of mandatory planning responsibilities with respect to the issuance of water permits, and we note that counsel for the Commission emphasized in his argument that the State Engineer and the Commission do have plans and do not reject the concept of prior planning. We agree with United Plainsmen that the discretionary authority of state officials to allocate vital state resources is not without limit but is circumscribed by what has been called the Public Trust Doctrine.

This doctrine was first clearly defined in *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), a case in which the United States Supreme Court was called upon to decide the competency of the State of Illinois to convey, by legislative grant, a portion of Chicago's harbor on Lake Michigan to the Illinois Central Railroad.

"That the State holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the State holds title to soils under tide water, by the common law, we have already shown, and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use.  *  *  *  It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties."  146 U.S. at 452, 13 S.Ct. at 118.

"The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace."  146 U.S. at 453, 13 S.Ct. at 118.

"We cannot, it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation.  But the decisions are numerous which declare that such property is held by the State, by virtue of its sovereignty, in trust for the public.  The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, is governmental, and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining."  146 U.S. at 455–56, 13 S.Ct. at 119.

■  The Commission, the State Engineer, and the lower court, while acknowledging the existence of this doctrine in North Dakota, interpret it in a narrow sense, limiting its applicability to conveyances of real property.  We do not understand the doctrine to be so restricted.  The State holds the navigable waters, as well as the lands beneath them, in trust for the public.  North Dakota's Constitution, Article XVII, § 210, states:

"All flowing streams and natural water courses shall forever remain the property of the state for mining, irrigating and manufacturing purposes."

Section 61–01–01, NDCC, further defines the public waters of this State:

"All waters within the limits of the state from the following sources of water supply, namely:

1.  Waters on the surface of the earth excluding diffused surface waters but including surface waters whether flowing in well defined channels or flowing through lakes, ponds, or marshes which constitute integral parts of a stream system, or waters in lakes;  and

2.  Waters under the surface of the earth whether such waters flow in defined subterranean channels or are diffused percolating underground waters;  and

3.  All residual waters resulting from beneficial use, and all waters artificially drained;  and

4.  All waters, excluding privately owned waters, in areas determined by the state engineer to be noncontributing drainage areas.  A noncontributing drainage area is hereby defined to be any area which does not contribute natural flowing surface water to a natural stream or watercourse at an average frequency oftener than once in three years over the latest thirty year period;

belong to the public and are subject to appropriation for beneficial use and the right to the use of these waters for such use, shall be acquired pursuant to the provisions of chapter 61–04."

Sections 61–04–06 and 61–04–07, NDCC, provide:

"**61–04–06.** *Approval of application—Endorsing approval—Contents.—*Upon the receipt of the proof of publication, the state engineer shall determine from the evidence presented by the parties interested, from such surveys of the water supply as may be available, and from the records, whether there is unappropriated water available for the benefit of the applicant. If so, he shall endorse his approval on the application, which thereupon shall become a conditional water permit allowing the applicant to appropriate water, and shall state in such approval the time within which the water shall be applied to a beneficial use."

"**61–04–07.** *Rejection of applications—Appeal to district court.—* If, in the opinion of the state engineer, no unappropriated water is available, he shall reject an application made under the provisions of this chapter. He shall decline to order the publication of notice of any application which does not comply with the requirements of the law and the rules and regulations thereunder. He may refuse to consider or approve an application or to order the publication of notice thereof if, in his opinion, the approval thereof would be contrary to the public interest. In determining the public interest, the state engineer shall be limited to those considerations within his jurisdiction. Any applicant, within sixty days from the date of refusal to approve an application, may appeal to the district court of the county in which the proposed place of diversion or storage is situated, from any decision of the state engineer which denies a substantial right. In the absence of such appeal, the decision of the state engineer shall be final."

These statutes provide a means by which those who seek use of public waters can petition the State Engineer for water permits. In the performance of this duty of resource allocation consistent with the public interest, the Public Trust Doctrine requires, at a minimum, a determination of the potential effect of the allocation of water on the present water supply and future water needs of this State. This necessarily involves planning responsibility. The development and implementation of some short- and long-term planning capability is essential to effective allocation of resources "without detriment to the public interest in the lands and waters remaining."

We believe that § 61–01–01, NDCC, expresses the Public Trust Doctrine.

The public trust concept has been acknowledged throughout the country in varying forms. Without using those specific terms, this court said, in *Baeth v. Hoisveen,* 157 N.W.2d 728, 733 (N.D.1968):

"North Dakota is, in part, a semi-arid State. Therefore, concern for the general welfare could well require that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable method of use of water be prevented, and that the conservation of such water be exercised with a view to the reasonable and beneficial use thereof in the interests of the people and the public welfare. We feel that the foregoing factors formed the basis for the legislative enactment of Section 61–01–01, N.D.C.C."

We said that section line right-of-way is a public trust in *Saetz v. Heiser,* 240 N.W.2d 67, 72 (N.D.1976).

In *Payne v. Kassab,* 11 Pa.Cmwlth. 14, 312 A.2d 86, 93 (1973), the court stated that the following Pennsylvania constitutional provision affixed a public trust concept to the management of public natural resources of that State:

" 'The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.' " [Con-

stitution of Pennsylvania, Art. I, Section 27.]

In declaring the taking of one-half acre of land from a public park to widen a public street to be constitutionally permissible, that court said:

"The result of our holding is a controlled development of resources rather than no development.

"We must recognize, as a corollary of such a conclusion, that decision makers will be faced with the constant and difficult task of weighing conflicting environmental and social concerns in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources." 312 A.2d at 94.

In an action for damages for the destruction of fish caused by the introduction of a "deleterious substance" into a creek in violation of a statute, the New Jersey court, in *State, Dept. of Envir. Pro. v. Jersey Central P. & L. Co.*, 125 N.J.Super. 97, 308 A.2d 671, 674 (1973), discussed the Public Trust Doctrine in the following terms:

"There can be little debate that the public trust has been diminished by the loss of these fish.

" * * * The State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable marine environment are protected, and to seek compensation for any diminution in that trust corpus."

It is evident that the Public Trust Doctrine is assuming an expanding role in environmental law. See 61 Am.Jur.2d 950, Pollution Control, § 145. As one author has commented:

"It is clear that the historical scope of public trust law is quite narrow. Its coverage includes, with some variation among the states, that aspect of the public domain below the low-water mark on the margin of the sea and the great lakes, the waters over those lands, and the waters within rivers and streams of any consequence. * * *

"If any of the analysis in this Article makes sense, it is clear that the judicial techniques developed in public trust cases need not be limited either to these few conventional interests or to questions of disposition of public properties. * * * Thus, it seems that the delicate mixture of procedural and substantive protections which the courts have applied in conventional public trust cases would be equally applicable and equally appropriate in controversies involving air pollution, the dissemination of pesticides, the location of rights of way for utilities, and strip mining on wetland filling on private lands in a state where governmental permits are required." Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich.L.Rev. 471, 556–557 (1969–1970).

No one has suggested the need for such an expansive application of the Public Trust Doctrine here. Confined to traditional concepts, the Doctrine confirms the State's role as trustee of the public waters. It permits alienation and allocation of such precious state resources only after an analysis of present supply and future need.

The Legislature has indicated its desire to see such planning take place, although not in mandatory language. Until the Legislature speaks more forcefully, we think the Public Trust Doctrine requires, as a minimum, evidence of some planning by appropriate state agencies and officers in the allocation of public water resources, and that the Environmental Law Enforcement Act (Chapter 32–40, NDCC) requires more than a plenary dismissal of the action.

█ United Plainsmen has requested a temporary restraining order, enjoining the further issuance of water permits pending trial on the merits in the lower court. A temporary injunction or restraining order may be granted if it appears by the complaint that the plaintiffs are entitled to the relief requested, and that such relief consists of restraining acts which would, if continued, produce injury to the plaintiffs during the litigation. Section 32–06–02, NDCC. We are not convinced that a tem-

porary restraining order is necessary or advisable in this instance.

During oral argument counsel for appellees stated that, of the total number of water permits considered each year, a very small percentage is in the industrial category relating to energy conversion. Of that small percentage of industrial water-use applications considered, only a few are actually granted and some that are granted will never be used because of other causes which prevent the intended development.

We express no opinion about the ultimate outcome of the trial on the merits, should that point be reached in this case. We acknowledge, however, that there is merit in the argument that the extent of planning is somewhat related to the sums appropriated therefor by the Legislature, and that United Plainsmen action to defeat legislation, such as S.B. 2088 and S.B. 2253, Forty-fourth Legislative Assembly, designed to accomplish more refined scientific planning, militates against its argument. Quite obviously, too, the type of study and impact statement which would have been necessary under the North Dakota Environmental Policy Act of 1975 (H.B. 1058, Forty-fourth Legislative Assembly), had it become law, are not required. It may be that the planning being done by the Commission, according to the oral argument made in this Court, is sufficient.

We hold that the dismissal was premature and improvident under the circumstances. The amended complaint charges a failure to devise any water conservation plan, as well as a failure to consider injury to the public. For the purpose of the motion to dismiss, the trial court and this Court must consider all allegations of the complaint to be true. We hold, accordingly, that the complaint does state a claim upon which relief could be granted, if proved, and, therefore, must be reinstated.

Reversed and remanded for further proceedings.

ERICKSTAD, C. J., and PAULSON, SAND and VOGEL, JJ., concur.