PYRAMID LAKE PAIUTE TRIBE OF INDIANS AND BOARD OF SUPERVISORS, LASSEN COUNTY, CALIFORNIA, APPELLANTS, v. WASHOE COUNTY, NORTHWEST NEVADA WATER RESOURCES LIMITED PARTNERSHIP, FISH SPRINGS RANCH LTD., AND R. MICHAEL TURNIPSEED, NEVADA STATE ENGINEER, RESPONDENTS.

No. 25066

June 14, 1996 918 P.2d 697

*Benesch & Fermóile,* Reno; *Fredericks, Pelcyger, Hester, & White,* Boulder, Colorado; *Robert D. Stitser,* Reno, for Appellants.

*Frankie Sue Del Papa,* Attorney General, and *Margaret A. Twedt,* Deputy Attorney General, Carson City; and *Hale, Lane, Peek Dennison & Howard* and *Alex J. Flangas,* Reno for Respondents.

## OPINION

By the Court, YOUNG, J.:

### FACTS

In the mid-1980s, Washoe County entered into joint ventures with Fish Springs Ranch LTD. ("FSR") and Northwest Nevada Water Resources Limited Partnership ("NNWR") for the purpose of importing groundwater from the Honey Lake Basin[1] to the Reno and Sparks areas. FSR and NNWR filed "intra-basin"

---

[1] Honey Lake Basin is a 2,200 square mile basin located on the California/Nevada border approximately thirty-five miles northwest of Reno. The portion of the Honey Lake Basin impacted by this dispute is located within Washoe County.

transfer applications with the Nevada State Engineer's Office to modify their existing Honey Lake Basin groundwater rights. Washoe County filed thirty-one "inter-basin" applications to transfer water from Honey Lake to the Truckee Meadows metropolitan area. Several of the applications were to change FSR's and NNWR's existing water rights to industrial and municipal use. The remaining applications by Washoe County requested the appropriation of additional water rights from the Honey Lake Basin. In total, the county was requesting permits to withdraw 28,588 acre feet of water annually from the Honey Lake Basin.

The State Engineer conducted twelve days of public hearings to consider the intra-basin and inter-basin transfer applications. The hearings produced 136 exhibits and more than 2,800 pages of testimony from experts and lay witnesses.

Co-appellants Pyramid Lake Paiute Tribe of Indians and Board of Supervisors, Lassen County, California ("appellants") opposed the transfer permits on environmental and economic grounds. One of appellants' contentions was that Washoe County's proposal was not economically feasible or desirable in light of negotiations that were occurring over water rights in Lake Tahoe, Pyramid Lake, the Truckee River and the Carson River. At the time of the hearings, California, Nevada, and various Indian tribes (including the Pyramid Lake Paiute Tribe) were attempting to reach a settlement that would greatly impact water rights on the Truckee River ("proposed negotiated settlement"). *See* Truckee-Carson-Pyramid Lake Water Rights Settlement Act, Pub. L. No. 101-618, 104 Stat. 3295 (1990).[2]

After the hearings, the State Engineer issued Ruling 3786, granting the "intra-basin" applications, and Ruling 3787, granting the "inter-basin" applications. Appellants petitioned for judicial review, claiming that the State Engineer did not enter adequate findings in compliance with NRS 533.370(3).[3] The district court granted judicial review and remanded the decision to the State Engineer. The district court concluded that the State

---

[2]When briefs were filed with this court in 1994, the proposed negotiated settlement was still not an operative water solution for Washoe County's needs. The county indicated that the agreement was not finalized, the Environmental Impact Statement was not completed, and various conservation measures were not implemented.

[3]NRS 533.370(3) provides:

Except as otherwise provided in subsection 5, where there is no unappropriated water in the proposed source of supply, or where its proposed use or change conflicts with existing rights, *or threatens to prove detrimental to the public interest, the state engineer shall reject the application* and refuse to issue the requested permit. . . .

(Emphasis added.)

Engineer did not specifically determine whether the applications were detrimental to the public interest.

On remand, the State Engineer determined that additional hearings were not necessary. Instead, his office issued Supplemental Rulings 3786A and 3787A. The forty-page supplemental rulings responded to the order of remand by reviewing the consideration of the public interest and making additional findings. The State Engineer identified the following policy considerations contained in Nevada water statutes to help define the public interest:

1. An appropriation must be for a beneficial use.
2. The applicant must demonstrate the amount, source and purpose of the appropriation.
3. If the appropriation is for municipal supply, the applicant must demonstrate the approximate number of persons to be served and the approximate future requirements.
4. The right to divert ceases when the necessity for the use of water does not exist.
5. The applicant must demonstrate the magnitude of the use of water, such as the number of acres irrigated, the use to which generated hydroelectric power will be applied, or the number of animals to be watered.
6. In considering extensions of time to apply water to beneficial use, the State Engineer must determine the number of parcels and commercial or residential units which are contained or planned in the area to be developed, economic conditions which affect the availability of the developer to complete application of the water to beneficial use, and the period contemplated for completion in a development project approved by local governments or in a planned unit development.
7. For large appropriations, the State Engineer must consider whether the applicant has the financial capability to develop the water and place it to beneficial use.
8. The State Engineer may also cooperate with federal authorities in monitoring the development and use of the water resources of the State.
9. [The State Engineer] may cooperate with California authorities in monitoring the future needs and uses of water in the Lake Tahoe area and to study ways of developing water supplies so that the development of the area will not be impeded.
10. Rotation in use is authorized to bring about a more economical use of supplies.

11. The State Engineer may determine whether there is over pumping of groundwater and refuse to issue permits if there is no unappropriated water available.

12. [The State Engineer] may determine what is a reasonable lowering of the static water level in an area after taking into account the economics of pumping water for the general type of crops growing and the effect of water use on the economy of the area in general.

13. Within an area that has been designated, the State Engineer may monitor and regulate the water supply.

After reviewing these guidelines, the State Engineer determined that substantial evidence indicated the Honey Lake importation project served the public interest. With respect to appellants' contentions that an agreement under the proposed negotiated settlement was a more attractive alternative to water importation, the State Engineer ruled as follows:

The State Engineer cannot evaluate all possible alternatives to any particular water project. The applicant, Washoe County, presumably already looked at the various alternatives. *The State Engineer finds that he must act on the applications before him and is not in a position to interfere with the decisions and responsibilities of Washoe County.* The State Engineer can only look at the applicant's ability to finance the project and finds [sic] it has the capability to put the water to beneficial use.

(Emphasis added.)

Appellants filed a second petition for judicial review, arguing that the State Engineer's public interest review was insufficient. The same district judge who issued the initial remand order disagreed. Appellants renew their contentions in this appeal.

## DISCUSSION

This appeal presents two issues for review: whether the State Engineer properly defined the meaning of "the public interest" and whether the Honey Lake importation project is detrimental to the public interest.

*Meaning of the public interest*

The appropriation of water in Nevada is governed by statute, and the State Engineer is authorized to regulate such appropriations. NRS 533.030(1); *see* NRS 533.370(3). "'An agency charged with the duty of administrating an act is impliedly

clothed with power to construe it as a necessary precedent to administrative action.'" State v. State Engineer, 104 Nev. 709, 713, 766 P.2d 263, 266 (1988) (citations omitted). Further, "'great deference should be given to the [administrative] agency's interpretation when it is within the language of the statute.'" *Id.* (citations omitted). While the agency's interpretation is not controlling, it is persuasive. State Engineer v. Morris, 107 Nev. 699, 701, 819 P.2d 203, 205 (1991).

Pursuant to NRS 533.370(3), the State Engineer must determine whether a proposed appropriation is detrimental to the public interest before issuing a water appropriation permit. Appellants argue that Nevada should follow the lead of the Idaho Supreme Court in Shokal v. Dunn, 707 P.2d 441 (Idaho 1985), where the Idaho Supreme Court defined the public interest using not only language from Idaho statutes, but also statutory criteria from Alaska.

Idaho's water law allows the Water Resources Director to deny a water permit if the requested appropriation conflicts with the local public interest. *Id.* at 447 (citing Idaho Code § 42-203A(5)(e)). In defining the term, the public interest, the *Shokal* court noted that instructive public policy considerations were contained throughout Idaho's water appropriation statutes. *Id.* at 448. Referencing those statutes, the court developed guidelines defining the public interest. *Id.* at 449.

We conclude that the State Engineer's thirteen guidelines adequately defined the public interest in this case. As in *Shokal,* the State Engineer reviewed Nevada's water appropriation statutes to develop guidelines for defining the public interest. *See Morris,* 107 Nev. at 701, 819 P.2d at 205; *State Engineer,* 104 Nev. at 713, 766 P.2d at 266.

Appellants contend, however, that the State Engineer's failure to include economic considerations or an analysis of alternatives in the public interest guidelines was a dereliction of duty. The *Shokal* court included such factors in the definition of the public interest for Idaho, incorporating statutory criteria that were enacted by Alaska. *Shokal,* 707 P.2d at 449 n.3 (citing Alaska Stat. § 46.15.080).[4]

Despite appellants' assertions regarding the definition of the

---

[4]Appellants also cite related cases and statutory schemes from other states. *See* Stempel v. Department of Water Resources, 508 P.2d 166, 172 (Wash. 1973); Neb. Rev. Stat. § 46-289 (1988). However, the Nevada Legislature has not adopted any water appropriation or environmental protection statute requiring or permitting the State Engineer to evaluate alternatives before granting permits.

public interest by the Idaho Court, we can find no indication that Nevada's legislature intended that the State Engineer determine public policy in Nevada by incorporating another state's statutes and vesting the state with the authority to reevaluate the political and economic decisions made by local government.

### 1. *Legislative intent*

We conclude that the *Shokal* Court's decision to judicially adopt statutes relating to water allocation in other western states would be contrary to the long-standing policy of this state. "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed." Johnson v. United States, 163 F. 30, 32 (1st Cir. 1908) (Holmes, J.). The Nevada Legislature, presumably aware of the broad definition of the public interest enacted by other states (particularly Alaska and Nebraska), demonstrated through its silence that Nevada's water law statutes should remain as they have been for over forty-five years. We recognize that some people may argue that the prior appropriation doctrine is not well suited to solve the modern demands for water across our arid state. However, the legislature—not this court—must signal a departure from such a long-recognized Nevada water policy.

### 2. *Power of Washoe County's elected officials*

Nevada water law statutes define separate roles for the State Engineer and Washoe County. We conclude that at the time this dispute arose, the legislature placed the burden of choosing between water use alternatives on the officials of Washoe County, not the State Engineer. In 1991, the legislature directed Washoe County to choose among competing methods of water augmentation and to develop a master plan for the preservation, distribution, and development of water resources.[5] This legislative

---

[5]In accordance with Nevada law, a board of county commissioners has the power to "acquire, construct, reconstruct, improve, extend or better a works, system or facilities for the supply, storage and distribution of water for private and public purposes." NRS 318.144 (working in conjunction with NRS 244.157). In 1991, the legislature amended specific legislation for Washoe County and provided that the members of the Washoe Board of County Commissioners were ex officio members of the Washoe County Regional Planning and Advisory Board. 1991 Nev. Stat., ch. 548, § 1 at 1727. In accordance with this change, the Board was vested with the power to "[d]evelop and revise, as necessary, plans for regional facilities for the present and future use of water resources within the region . . .[;] [i]dentify potential supplies of water and determine the extent of those supplies and the nature of the problems involved in their development and management[;] [and] [d]evelop efficient methods for the collection, storage, management,

mandate necessarily empowered Washoe County's local officials to conduct economic and cost-effectiveness analyses of competing water projects, and to determine which alternative was optimal. In contrast, NRS 533.370(3), which has remained essentially unchanged for decades, limits the role of the State Engineer. The State Engineer has no express authority to engage in a comparative economic analysis of water delivery alternatives.

Our conclusion is supported by the ruling in Helms v. State Environmental Protection Division, 109 Nev. 310, 849 P.2d 279 (1993). In *Helms,* this court concluded that the Nevada Division of Environmental Protection ("NDEP") did not have a duty to independently review a function that was statutorily reserved to county government, thereby allowing the NDEP to *presume* the county's approval was valid. *Helms,* 109 Nev. at 314, 849 P.2d at 282.

This decision is also consistent with our recent ruling in Serpa v. County of Washoe, 111 Nev. 1081, 901 P.2d 690 (1995). In *Serpa,* we considered Washoe County's power as a local government to make water use decisions, and we approved of Washoe County's denial of a developmental permit that was previously approved by the State Engineer. *Id.* at 1085, 901 P.2d at 693.

In the instant case, the legislature specifically empowered Washoe County to choose among competing methods of water augmentation projects. This necessarily demands an economic and cost-effectiveness analysis of competing water delivery alternatives within Washoe County. If Washoe County's proposed water project would unreasonably lower water tables, prove financially unworkable or result in harm to wildlife or existing water users, the State Engineer is authorized to reject the application. However, Washoe County—and not the State Engineer—is required by statute to conduct the political and economic decision-making required to determine which water allocation alternative is appropriate.

### 3. *The State Engineer's lack of resources*

Furthermore, the legislature's failure to increase funding for the State Engineer's staff impliedly reinforces the conclusion that the legislature placed the burden of evaluating economic considerations and project alternatives on local government. *See* United Plainsmen Ass'n v. North Dakota State Water Conservation

---

treatment and delivery of water in order to increase the yield of existing supplies within the region." *Id.,* § 6 at 1729. Finally, the legislation granted the board the authority to "[m]ake recommendations concerning the management and use of water within the region to: . . . [among others] [t]he state engineer." *Id.*

Comm., 247 N.W.2d 457, 464 (N.D. 1976) (acknowledging that the appropriation of funds to conduct water use planning indicates an intent to include an agency in such planning).

The State Engineer employs a relatively small staff: clerical workers, a hearing officer, and a number of engineers familiar with principles of hydrology. At the present time, the State Engineer struggles under a backlog of 4,200 applications for water appropriation. *Senate Committee on Finance; Joint Subcommittee on Public Safety, Natural Resources and Transportation Budget Closing Action; April 17, 1995,* at 1 (1995). Of these applications, 1,468 are contested, requiring a hearing and possible judicial review. *Id.* The State Engineer estimates that he will continue to receive over 1,200 applications per year, 200 of which will be contested. *Id.* Consequently, as the State Engineer acknowledges, some applications have been awaiting processing since 1978 or 1979. *Minutes of the Joint Subcommittee Meeting of Senate Committee on Finance and Assembly Committee on Ways and Means: Sixty-eighth Session, April 28, 1995,* at 21 (statement of R. Michael Turnipseed, State Engineer). In the present case, the State Engineer recognized his office does not have the resources or personnel to weigh the social and political factors inherent in an economic analysis of competing water projects.

Accordingly, we conclude that the State Engineer did not commit a dereliction of duty by not including a review of economic considerations and alternative projects as part of the guidelines defining the public interest. *Morris,* 107 Nev. at 701, 819 P.2d at 205; *State Engineer,* 104 Nev. at 713, 766 P.2d at 266.

### Detriment to the public interest

Appellants contend that the State Engineer's findings regarding the public interest were not supported by substantial evidence. When reviewing the State Engineer's findings, factual determinations will not be disturbed on appeal if supported by substantial evidence. *Morris,* 107 Nev. at 701, 819 P.2d at 205. Moreover, as a general rule, a decision of an administrative agency will not be disturbed unless it is arbitrary and capricious. Shetakis Dist. v. State, Dep't Taxation, 108 Nev. 901, 903, 839 P.2d 1315, 1317 (1992).

The State Engineer's findings of fact in Supplemental Rulings 3786A and 3787A cite specific testimony taken in twelve days of public hearings amassed in over 2,800 pages of transcripts. The State Engineer found that "it is in the public interest to facilitate

augmentation of the Reno-Sparks water supply as well as to augment the supply in some of the valleys north of Reno-Sparks that have declining water tables.''

The State Engineer determined that other public interest values would not be compromised, specifically finding that the county had the ability to finance the project and "the capability to put the water to beneficial use." The State Engineer also found that no evidence suggested pumping groundwater would result in an impairment of other water rights. Additionally, the State Engineer found that pumping groundwater would not unreasonably lower water tables. With respect to environmental impact, the State Engineer found that "there was substantial evidence presented to indicate that wildlife would not be impacted as a result of these proposed changes [pumping water from the basin]." Specifically, the State Engineer reported that

> [t]estimony was received that showed the high mountain springs used by wildlife to the south and east of the proposed well field were not connected to the alluvial aquifer system. Any lowering of the water table and resulting impact or dying out of phreatophytes, such as greasewood, would result in xerophytic species, such as rabbitbrush and sagebrush taking the vacated space. Testimony was received that large game animals rely on xerophytes and not phreatophytes for forage.

The State Engineer found that a minimal loss of wetlands would occur and that alkali flats would not "be substantially enlarged," resulting in no increase in dust hazards proving "detrimental to the public interest."

With regard to the proposed negotiated settlement, the State Engineer found "no evidence that the approval of the intra-basin changes affects the [ongoing] Truckee River settlement negotiations." In addition, the State Engineer also found that "there is no evidence in the record that the water pumped from Honey Lake Valley could not or will not be coordinated and integrated with the negotiated settlement on the Truckee River."

At the hearings conducted by the State Engineer, Washoe County presented expert testimony indicating that even if the proposed negotiated settlement were finalized, the county would still need water from the Honey Lake project. Washoe County's experts claimed that the proposed negotiated settlement would not adequately improve groundwater conditions for development areas north of Reno. Experts also testified that the importation project was more cost-effective than the proposed negotiated settlement would be. Based on this testimony and the speculative nature of the negotiated settlement when this dispute arose, we

conclude that the State Engineer properly presumed that Washoe County already reviewed available alternatives to the Honey Lake project. *See Helms,* 109 Nev. at 314, 849 P.2d at 282.

Accordingly, we conclude that the State Engineer's findings of fact regarding the proposed negotiated settlement were supported by substantial evidence. *Shetakis Dist.,* 108 Nev. at 903, 839 P.2d at 1317; *Morris,* 107 Nev. at 701, 819 P.2d at 205.

## CONCLUSION

We conclude that the State Engineer adequately defined the public interest in this case and based his findings upon substantial evidence.

SHEARING and ROSE, JJ., concur.

SPRINGER, J., with whom STEFFEN, C. J., agrees, dissenting:

The trial court, in its remand order of August 31, 1992, recognized the State Engineer's failure to abide by NRS 533.370(3),[1] which commands the State Engineer to "refuse to issue the requested permit" where "its proposed use . . . threatens to prove detrimental to the public interest." In its remand order (hereinafter "Remand"), the trial court ruled that the State Engineer had not, in issuing the subject permits, properly considered vital public interest issues raised by the protestants and sent the matter back to the State Engineer with instructions on how to proceed properly in accordance with the law. Because the State Engineer refused (or at least failed) to comply with the district court's orders, and because crucial public policy issues relating to this huge inter-basin water transfer remain unconsidered and undecided by the State Engineer, I dissent.

In its Remand, the trial court gave explicit and quite appropriate instructions to the State Engineer as to how he should proceed:

*First,* the trial court instructed the State Engineer that by law

---

[1] NRS 533.370(3) provides:

 **533.370 Approval or rejection of application by state engineer: Conditions; procedure.**

. . . .

 3. Except as otherwise provided in subsection 5, where there is no unappropriated water in the proposed source of supply, or where its proposed use or change conflicts with existing rights, or *threatens to prove detrimental to the public interest,* the state engineer shall reject the application and refuse to issue the requested permit. Where a previous application for a similar use of water within the same basin has been rejected on these grounds, the new application may be denied without publication.

(Emphasis supplied.)

he was "charged with determining whether granting certain permits threatened to prove detrimental to the 'public interest.'"

*Second,* the trial court recognized the "lack of any specific legislative criteria to be evaluated in determining the public interest, or any threat thereto" and that "the legislature [had] declined to define 'public interest,' or the factors that should be considered in defining this term." The legislature, thus, had "delegated the responsibility for defining the 'public interest' to the state engineer."

*Third,* the trial court ruled that the "bald," unsupported and conclusory "finding by the state engineer that the granting of a permit does not threaten to prove detrimental to the public interest is, by itself, insufficient" and that "[s]uch a finding of ultimate fact must be accompanied by additional findings concerning the basic evidentiary facts relied upon to support the finding of ultimate fact." *Citing* Nova Horizon, Inc. v. City Council of Reno, 105 Nev. 92, 98, 769 P.2d 721, 724 (1989).

*Fourth,* the trial court ruled that the "basic evidentiary facts" relating to the public interest must be weighed in a manner that "necessarily entails a balancing of myriad competing interests."

In sum, then, the trial court quite properly refused to accept the State Engineer's "bald finding that approving the change applications will not be detrimental to the public interest."[2] In accordance with this ruling the trial court remanded the application proceedings to the State Engineer, *ordering* (1) that the Engineer furnish an administrative definition of the meaning of the statutory expression, "threatens to prove detrimental to the public interest," (2) that the State Engineer make "additional findings concerning the basic evidentiary facts relied upon to support" his conclusion on the public interest issue, (3) that the State Engineer make the required public interest adjudication based upon his "additional findings" of fact and by the process of "a balancing of myriad competing interests."

The trial court's rulings on remand were absolutely necessary because, as put by the trial court, the courts are "entitled to know and review the State Engineer's factual bases for this finding" of no threat to the public interest. The basic and jurisdictional defect in this case that has not been overcome arises out of the State Engineer's ignoring entirely the trial court's order of remand. The State Engineer refused to define the crucial term "threatens to prove detrimental to the public interest." The State Engineer

---

[2]The only finding or conclusion by the State Engineer relating to the public interest was the following "bald finding":

> The State Engineer finds no evidence that approval of the subject change applications would be detrimental to the public interest.

refused to make the "additional" findings of fact that he was ordered to make in order to provide a "factual basis" for his rulings. The State Engineer refused to balance the "myriad competing interests" that were presented by the applicants and by the protestants, Lassen County and the Pyramid Lake Paiute Tribe. I cannot begin to understand why the trial court permitted the State Engineer to get away with ignoring the proper orders contained in the Remand. It is difficult to understand why this court would permit this to happen.

## DEFINING THE "PUBLIC INTEREST" AND "THREATS THERETO"

NRS 533.370(3) comprises an unequivocal mandate to the State Engineer, commanding that the State Engineer *refuse* to issue any permit where the proposed use "threatens to prove detrimental to the public interest." Because the legislature did not define the quoted term, the duty to define what is a threat to the public interest becomes the administrative duty of the State Engineer; yet the State Engineer adamantly refuses to perform this duty. The State Engineer's impertinent response to the district court's order to define administratively the subject statutory expression was to compile an odd medley of thirteen "principles," none of which have the slightest thing to do with the subject of how the public interest should be treated in matters relating to the use of water in this state. These "principles" are set out in the body of the majority opinion. The irrelevance of the State Engineer's rambling, unresponsive statement of "principles" is immediately apparent. Rather than defining the statutory public interest phrase, the State Engineer listed a bunch of statutory citations together with a recitation of a number of things that he believes a hypothetical applicant for a water use permit "must" do in order to be successful. For example, the State Engineer recited among his thirteen "principles" the quite obvious requirements that an applicant "must demonstrate the amount, source and purpose of the appropriation," and "must demonstrate the magnitude of the use of water." The statement of "principles" also recited a number of things that the State Engineer "may" do ("may cooperate with federal authorities," "may monitor and regulate the water supply"). The irrelevant and uncalled-for "principles" or "guidelines" compiled by the State Engineer merely comprise a useless summary of readily accessible statutory water law.

None of the recited principles makes any reference at all to the dispositive issue in this case, the threat or lack of threat to the public interest. After compiling his list of statutory "mays" and "musts," the State Engineer relied on these statutory abstracts

(rather than on an intelligible definition of the meaning of a threat to public interest) as support for his post-Remand conclusion that the proposed project was not a threat to the public interest—when in truth, the statutory references have no palpable connection to the only issue presented in this controversy. It is very clear that the State Engineer's itemization of readily-available statutory "principles" or guidelines does not comply with the district court's mandate on remand and certainly provides no definition of the term, "*threatens to prove detrimental to the public interest.*"

It was not at all difficult for the State Engineer to provide a useful, administrative definition of the subject statutory expression. There are numerous examples of definitions of the public interest as it relates to water matters that can be taken from statutes and judicial decisions of other states.[3] As can be seen in

---

[3]For example, reference may be made by the State Engineer to the Alaska Statute, section 46.15.080, which states, in pertinent part:

> (b) In determining the public interest, the commissioner shall consider (1) the benefit to the applicant resulting from the proposed appropriation;
> (2) *the effect of the economic activity resulting from the proposed appropriation;*
> (3) the effect on fish and game resources and on public recreational opportunities;
> (4) the effect on public health;
> (5) the effect of loss of alternate uses of water that might be made within a reasonable time if not precluded or hindered by the proposed appropriation;
> (6) harm to other persons resulting from the proposed appropriation;
> (7) the intent and ability of the applicant to complete the appropriation;
> (8) the effect upon access to navigable or public waters.

The Idaho Supreme Court has ruled that the state water agency must consider the economic consequences of a proposed water use to protect the "public interest." Shokal v. Dunn, 707 P.2d 441, 449 (Idaho 1985). The Idaho Supreme Court turned to the Alaska statute for guidance because the Alaska water permit statute states in detail what broad public interest concerns the relevant administrative agency must consider, including the economic effect of the proposed water use. *Id.* at 449. The Idaho Supreme Court approved and adopted the public interest elements listed in the Alaska statute, but warned that those elements "are not intended to be a comprehensive list." *Id.* The Idaho Supreme Court determined that state agencies must examine the economic effect of any proposed appropriation of water to protect the public welfare.

The Nebraska Legislature enacted a statute which directs the Director of Water Resources to consider: (1) the economic, environmental, and other benefits of the proposed inter-basin transfer and use; (2) any adverse impacts of the proposed inter-basin transfer and use; (3) any current beneficial uses being made of the unappropriated water in the basin of origin; (4) any reasonably foreseeable future beneficial uses of the water in the basin of origin; (5) the economic, environmental, and other benefits of leaving the water in the basin of origin for current or future beneficial uses; (6) alternative sources of water supply available to the applicant; and (7) alternative sources of water available to the basin of origin for beneficial uses. Neb. Rev. Stat. § 46-289 (1986).

the statutes cited in the margin, other states have defined the public interest in water matters and have suggested a broad range of factors that present themselves as being worthy of consideration in any controversy in which it is claimed that the public interest is threatened.[4] If the State Engineer had defined the statutory, public interest language and furnished standards by which he was going to evaluate claimed threats to the public interest under NRS 533.370(3), then he would have been in a position to have gone on and made the required findings of fact. From these findings he could have based a proper adjudication that was in compliance with NRS 533.370(3). Because the State Engineer failed to define the public interest—or, rather, because he refused to abide by the instruction of the district court that he do so—the trial court thereby erred in affirming the State Engineer's approval of the permits in complete disregard of the necessary conditions imposed by the Remand. The State Engineer, rather clearly, granted permit applications which should, under NRS Chapter 533, have been "refused."

## STATE ENGINEER'S REFUSAL TO MAKE FACT FINDINGS AND TO BALANCE COMPETING INTERESTS

The root of most of the defects in the State Engineer's administrative handling of these applications is the absence of a workable definition of "threatens to prove detrimental to the public interest"; but there are other reasons why the permits should be disallowed and the matter returned to the State Engineer. The State Engineer's refusal or failure to make the ordered "additional findings" is also sufficient of itself to warrant sending this case back to the State Engineer, so that he can do it right. I will not dwell on this point other than to say that the trial court in its

---

[4]The majority expresses great concern about "[t]he State Engineer's lack of resources" and the costs to the state that might arise out of the State Engineer's conscientiously following the statute and making the required adjudication that a particular water use does not pose a threat to the public interest. There is nothing in the record to support the majority's conjectural apprehensions; and, even, if there were, this is a legislative matter. If the legislature were to conclude that protecting the public interest in water-use matters is too costly, it is free to repeal the statute that commands that the State Engineer "shall . . . refuse to issue" permits which threaten to be detrimental to the public interest.

This court has not, to date, considered the mandate of NRS 533.370(3); and it would seem safe to say that the public interest issue is not one that has been of great trouble to the State Engineer. In cases, however, where massive inter-basin water exchanges are involved and bona fide protests raising public interest issues are filed, we see no way in which the State Engineer can, under the present statutory structure, avoid defining terms, finding facts and rendering an adjudication on this issue, even when the merits of an application have been affirmatively treated by local governmental entities.

Remand was obviously right when it concluded that the "bald" finding that the public interest was not threatened by these inter-basin water exchanges "must be accompanied by additional findings concerning the basic evidentiary facts relied upon to support" such a conclusion. I also agree with the trial court that such a conclusory finding was "not sufficient to permit judicial review" and that a reviewing court (including this one) "is entitled to know and review the State Engineer's factual bases for this finding" of no threat to the public interest. *See Nova Horizon Inc.*, 105 Nev. 92, 769 P.2d 721. This failure on the part of the State Engineer clearly calls for a remand to that administrative agency rather than the bland approval given by this court to the State Engineer's derelictions in the administrative process.

## STATE ENGINEER'S FAILURE TO BALANCE COMPETING INTERESTS

An even more significant dereliction on the part of the State Engineer (because of its dire implications in the future) is the State Engineer's refusal to consider the competing interests, public versus private, that are presented by the protest filed by the Paiute Tribe and by Lassen County. These protestants maintain that they have offered unattended-to alternatives to the Honey Lake Project and to the inter-basin water exchanges approved by the State Engineer which are far superior to the approved proposal and which are beneficial to rather than detrimental to the public interest. The State Engineer has steadfastly refused to consider public and private competing interests or to take into account alternative plans for water use and water conservation offered by the protestants.

The State Engineer told the district court (and now tells this court) that he had no authority to interfere with decisions made by local government and that he acted in the assumption that he was compelled to grant permits after approvals of the project were made on the local level. When the State Engineer announced that he would not "interfere with the decisions and responsibilities of Washoe County,"[5] he was abdicating his responsibility under NRS 533.370(3) and, as well, under NRS 540.011(1), which declares the "critical nature of the state's limited water resources" and provides that the "policy of the state [is] to encourage efficient and nonwasteful use of these limited supplies." When the State Engineer told the district court that he did not have the power to interfere with the decisions of Washoe County in water matters, he was acting in direct contravention of NRS 533.370(3), which does not permit him to issue a

---

[5]State Engineer's Supplemental Ruling No. 3787A at 19.

"requested permit" if the "proposed use" threatens the public interest. If the public interest is threatened, it matters not what decision Washoe County or any other governmental subdivision might make relative to a proposed water use. If it is contended (as is the case here) that the proposed water use presents a threat to the public interest of the people of this state, the State Engineer *must* weigh competing interests and then decide whether the public interest is threatened in the manner claimed and, if such a threat exists, *must* "refuse to issue the requested permit," even though Washoe County had made a contrary decision.

It is clear that the State Engineer's authority and his responsibility to protect this State's "limited water resources" and to ensure "efficient and nonwasteful use of these limited supplies," supersede all local governmental power. This is not to say, of course, that the State Engineer is placed in the position of having to choose among all possible water uses every time he is faced with a grant or do-not-grant decision on a water permit application. All that the statute requires of the State Engineer in the controversy at hand is that he define the term "threatens to prove detrimental to the public interest," that he make findings of fact relative to the protestants' contention that the granting of the "proposed use" was a threat to the public interest, that he "balance" the competing public and private interests called to his attention by the protestants, that he adjudicate the protestants' contention that the project in question threatened to prove detrimental to the public interest, and that he furnish reasons for his decisions. The State Engineer did none of these things.

The State Engineer claims that it is sufficient for him merely to consider the "four corners" of the applications themselves and that he has no duty to go further than this. It is difficult to accept the contention that the critical public interest issues presented by this case can be resolved merely by inspection of the application documents themselves. Sound judgment as to whether permitting this massive inter-basin water transfer is a threat to the public interest cannot be made without some consideration being given to the alternatives offered by the protestants to the granting of this application.

> The existence of a more desirable alternative is one of the factors which enters into a determination of whether a particular proposal would serve the public convenience and necessity. That the Commission has no authority to command the alternative does not mean that it cannot reject the proposal.

City of Pittsburgh v. Federal Power Comm'n, 237 F.2d 741, 751 n.28 (D.C. Cir. 1956). In the present case, although the State

Engineer "has no authority to command the alternative," this does not mean that the State Engineer cannot reject the proposal if he determines that the proposal poses a threat to the public interest.

Protestants (appellants herein) raised a number of public interest issues. For example, protestants presented evidence during the hearings below that granting the change applications threatened to prove detrimental to nearby Pyramid Lake and was a danger to two species of fish, the Lahontan cutthroat trout, a threatened species, and the cui-ui, an endangered species. Testimony was also presented that granting the applications would have an adverse effect on nearby wetlands, plant life and the wildlife in and around the basin. Evidence was presented that approval of the applications could result in increased dust pollution. Obviously, neither this court nor the district court can afford a meaningful review of the State Engineer's decrees absent some discussion and fact-findings on the foregoing public interest issues.

Protestants also raised public interest issues relative to the State Engineer's refusal to consider available alternatives to the project that protestants offered during the administrative proceedings. The trial court's Remand pointed out the necessity of the "balancing of myriad competing interests"; yet, the State Engineer refused to consider proposed alternatives, a refusal which protestants claim will result in unnecessary, wasteful or uneconomical water uses.

The State Engineer has strongly resisted any suggestion that he is obliged to consider available alternatives to the water exchanges which he has approved, claiming that it is not his job to make choices as to optimum water usage. As mentioned, the State Engineer is correct in stating that he is not obliged to decide which of several possible water uses is optimal; but this is not to say that he is not obliged to *examine* available alternatives, presented formally as a protest, in making a judgment on the public interest issue. If, for example, a protestant were to claim in an application hearing, first, that granting of the application would not be cost effective, would be wasteful of water and would have an extremely adverse environmental effect and, second, that a readily available alternative would avoid all such "threat[]s" to the public interest, then the State Engineer could not properly and legally turn a deaf ear on the claims of such a protestant. Such claims call for careful consideration and for findings of fact that would justify the State Engineer's conclusions that granting of the subject applications either was or was not a threat to the public interest.

Protestants offered to the State Engineer an alternative called

the "Negotiated Settlement."[6] The protestants claimed that rejection of that alternative and granting of the applications would result in a threat of detriment to the public interest. Protestants claim that the offered alternative is manifestly superior to the now-approved multimillion dollar Honey Lake Project (which incurs a substantial public expenditure) and would produce at least two-thirds more water. It appears from this record that the State Engineer has refused to consider *any* alternatives to the project. Without considering the alternatives to the Honey Lake Project presented by the protestants, the State Engineer was clearly unable to make an informed judgment as to whether granting the applications threatens to prove detrimental to the public interest.

Of course, even if the State Engineer were to conclude that options proffered by the protestants were superior, economically or environmentally, to those accepted by Washoe County and by the State Engineer, this alone would not mean that the granting of the applications necessarily threatened to prove detrimental to the public interest. The point is that when protestants come in and furnish evidence of a proposed water use plan that they claim is far superior to that accepted by the County and the State Engineer, the State Engineer may not ignore such evidence and is required to give some cognizance to these claims. The State Engineer is not in a position to make a considered yes or no decision as to whether a public interest threat is present until he has made some evaluation of the opposing claims. If, for example, in a hypothetical situation, the State Engineer had granted a comparable inter-basin permit and was told by protestants that there was a readily-available alternative plan that would clearly conserve many thousands of acre-feet of water per year in evaporation or other water loss, then, naturally, the State Engineer would be bound to take a look at such an alternative plan to determine if accepting the plan proposed by the pending applications would be clearly wasteful and thus a threat to the public interest.

---

[6] The "Negotiated Settlement" is legislation which was passed by the United States Congress. The purposes of the Negotiated Settlement are: (1) to equitably divide the disputed Tahoe river waters; (2) to make good on obligations owed to the injured American Indian tribes; (3) to settle and avoid litigation; and (4) to improve the habitat of local fish and migratory waterfowl.

To these ends, the Negotiated Settlement allocates the Lake Tahoe Basin waters, provides for payments to the Pyramid Lake Indian Tribe, and includes provisions to improve and protect wetland habitat. For a thorough discussion of the Negotiated Settlement, the reader is referred to E. Leif Reid, *Ripples from the Truckee: The Case for Congressional Apportionment of Disputed Interstate Water Rights,* 14 Stan. Envtl. L.J. 145 (1995).

The decisions of local governmental officials in water matters might in some instances prove to be a threat to the public's interest in water conservation. The Legislature has told the State Engineer that he must inquire into matters relating to overall public interest in all water permit matters. In cases where the issue of public interest has been expressly raised by protestants to the application, it is the duty of the State Engineer to make findings and to adjudicate the public interest issue required to be considered by the language of the statute. Under the present opinion he is freed in the future from having to perform this statutory duty.

## PUBLIC TRUST DOCTRINE

Before a prospective user of water is allowed to use available water, an application for the right to use that water must be filed with the State Engineer and approved by the State Engineer. The State Engineer's refusal to consider alternatives to the project is not consistent with the exercise of his functions as the trustee of water resources in Nevada and his responsibility to insure that "all sources of water supply with the . . . state whether above or beneath the surface of the ground" is managed as an asset belonging to the public.[7] NRS 533.025. In refusing to consider any of the alternatives presented by the protestants to the use proposed by the applicants, the State Engineer has violated his trust and has failed to consider adequately the public's interest in its water resources.

Consideration of alternatives is necessary in order to permit the State Engineer to make informed findings and conclusions relative to comparative cost-effectiveness, efficiency, waste avoidance and environmental impact. The public interest requires the largest possible economic use of state waters. Ormsby County v. Kearney, 37 Nev. 314, 142 P. 803 (1914). Whether the Honey Lake Project or the Negotiated Settlement or some other water use plan offers the most economic use of state waters is a question unanswered in these proceedings and is a question that should have been answered by the State Engineer. As mentioned before, the State Engineer has no authority to command the alternative, but the State Engineer does have the power to reject a proposal in

---

[7]Under the Public Trust Doctrine, the state government, as trustee of all public natural resources, owes a fiduciary obligation to the general public to maintain public uses unless an alternative use would achieve a countervailing public benefit. *See* Nat. Audubon Soc. v. Super. Ct. of Alpine Cty, 658 P.2d 709, 712 (Cal. 1983). Thus, the Public Trust Doctrine serves to protect public expectations in natural resources held in common against destabilizing change. Joseph L. Sax, *Liberating the Public Trust Doctrine from Its Historical Shackles,* 14 U.C. Davis L. Rev. 185, 188 (1980).

cases, for example, where there are clearly superior alternatives. In such a case, the public interest would not be served by approving a substantially inferior and wasteful proposal.

The State Engineer's failure or refusal to find facts and his failure or refusal to balance the various, conflicting public and private interests presented by the protestants invalidate all of the administrative proceedings and decisions of the State Engineer. The State Engineer is guilty of a number of clear violations of Nevada's water law and particularly of failing to comply with the public interest requirements of NRS 533.370(3). Under such circumstances it is difficult to see how the State Engineer's granting of these permits can possibly be permitted to stand.

## CONCLUSION

This appeal involves purely legal questions which can be decided by this court "without deference to the agency's decision." Mirage v. State, Dep't of Administration, 110 Nev. 257, 259, 871 P.2d 317, 318 (1994). Not only did the State Engineer act in defiance to the trial court's Remand, the State Engineer clearly acted in contravention of Nevada water law and in violation of NRS 533.370(3). I have enumerated a number of errors of law which call for reversal and for a remand to the State Engineer; but the consequence of this decision that gives me the most concern is that henceforth the State Engineer is allowed, if not directed, to ignore the clear mandate of NRS 533.370(3) relative to the interest of all Nevadans in making the best possible use of their limited water resources. This is unfortunate. The judgment of the majority of this court "threatens to prove detrimental to the public interest"; therefore, I dissent.