**136 Nev., Advance Opinion 58**

# IN THE SUPREME COURT OF THE STATE OF NEVADA

MINERAL COUNTY; AND WALKER LAKE WORKING GROUP,
Appellants,
vs.
LYON COUNTY; CENTENNIAL LIVESTOCK; BRIDGEPORT RANCHERS; SCHROEDER GROUP; WALKER RIVER IRRIGATION DISTRICT; STATE OF NEVADA DEPARTMENT OF WILDLIFE; AND COUNTY OF MONO, CALIFORNIA,
Respondents.

No. 75917

FILED

SEP 17 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Certified questions under NRAP 5 concerning Nevada's public trust doctrine. United States Court of Appeals for the Ninth Circuit; A. Wallace Tashima, Raymond C. Fisher, and Jay S. Bybee, Circuit Judges.

*Question answered.*

Simeon M. Herskovits, El Prado, New Mexico; Sean A. Rowe, District Attorney, Mineral County,
for Appellants Mineral County and Walker Lake Working Group.

Aaron D. Ford, Attorney General, Heidi Parry Stern, Solicitor General, Bryan L. Stockton, Senior Deputy Attorney General, and Tori N. Sundheim, Deputy Attorney General, Carson City,
for Respondent State of Nevada Department of Wildlife.

Best, Best & Krieger LLP and Roderick E. Walston, Walnut Creek, California; Law Office of Jerry M. Snyder and Jerry M. Snyder, Reno; Stephen B. Rye, District Attorney, Lyon County,
for Respondent Lyon County.

20-34246

Best, Best & Krieger LLP and Roderick E. Walston, Walnut Creek, California; Law Office of Jerry M. Snyder and Jerry M. Snyder, Reno, for Respondent Centennial Livestock.

Woodburn & Wedge and Gordon H. DePaoli, Dale E. Ferguson, and Domenico R. DePaoli, Reno, for Respondent Walker River Irrigation District.

Schroeder Law Offices, P.C., and Laura A. Schroeder and Therese A. Ure, Reno, for Respondent Schroeder Group.

Law Office of Jerry M. Snyder and Jerry M. Snyder, Reno; Stacey Simon, County Counsel, and Jason Thomas Canger, Deputy County Counsel, Mono County, California, for Respondent County of Mono, California.

Aaron D. Ford, Attorney General, Heidi Parry Stern, Solicitor General, and James N. Bolotin, Senior Deputy Attorney General, Carson City, for Amicus Curiae Nevada State Engineer.

Benson Law Nevada and Kevin Benson, Carson City; Xavier Becerra, Attorney General, and Nhu Q. Nguyen, Deputy Attorney General, Sacramento, California, for Amicus Curiae State of California.

Jason D. Woodbury, District Attorney, Carson City; Taggart & Taggart, Ltd., and Paul G. Taggart and Timothy D. O'Connor, Carson City, for Amicus Curiae Carson City.

Hanson Bridgett LLP and Michael J. Van Zandt, San Francisco, California, for Amici Curiae Churchill County, City of Fallon, and Truckee-Carson Irrigation District.

Mark B. Jackson, District Attorney, and Douglas V. Ritchie, Chief Deputy District Attorney, Douglas County, for Amicus Curiae Douglas County.

Tyler J. Ingram, District Attorney, and Rand J. Greenburg, Deputy District Attorney, Elko County, for Amici Curiae Elko County and Humboldt River Basin Water Authority.

Michael Macdonald, District Attorney, Humboldt County,
for Amicus Curiae Humboldt County.

Theodore C. Herrera, District Attorney, Lander County,
for Amicus Curiae Lander County.

R. Bryce Shields, District Attorney, Pershing County,
for Amicus Curiae Pershing County.

Anne M. Langer, District Attorney, Storey County,
for Amicus Curiae Storey County.

Taggart & Taggart, Ltd., and Paul G. Taggart and Timothy D. O'Connor,
Carson City,
for Amicus Curiae City of Fernley.

Law Offices of Wes Williams, Jr., P.C., and Wes Williams, Jr., Schurz,
for Amicus Curiae Walker River Paiute Tribe.

King & Russo, Ltd., and Patrick O. King, Carson City,
for Amicus Curiae Carson Water Subconservancy District.

Schroeder Law Offices, P.C., and Therese A. Ure and Laura A. Schroeder,
Reno,
for Amicus Curiae Pershing County Water Conservation District.

Gregory J. Walch, Steven C. Anderson, and Brittany L. Cermak, Las Vegas,
for Amicus Curiae Southern Nevada Water Authority.

McDonald Carano LLP and Michael A.T. Pagni, Reno,
for Amici Curiae Truckee Meadows Water Authority, Washoe County Water
Conservation District, and Carson-Truckee Water Conservation District.

Brett C. Birdsong, Las Vegas,
for Amicus Curiae Law Professors.

Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno; John D. Echeverria, South Royalton, Vermont; Robert Johnston, Carson City,
for Amici Curiae Natural Resources Defense Council, Sierra Club, Western Resource Advocates, National Wildlife Federation, and Nevada Wildlife Federation.

Taggart & Taggart, Ltd., and Paul G. Taggart and David H. Rigdon, Carson City,
for Amici Curiae Nevada Farm Bureau Federation, Nevada Cattlemen's Association, Lyon County Farm Bureau, and Elko County Farm Bureau.

Parsons Behle & Latimer and Gregory H. Morrison, Reno,
for Amicus Curiae Nevada Mining Association.

Blanchard, Krasner & French and Steven M. Silva, Reno,
for Amicus Curiae Pacific Legal Foundation.

Simons Hall Johnston PC and Brad M. Johnston, Yerington,
for Amici Curiae Peri & Sons Farms, Inc., Desert Pearl Farms, LLC, Peri Family Ranch, LLC, Jason Corporation, and Frade Ranches, Inc.

---

BEFORE THE COURT EN BANC.[1]

*OPINION*

By the Court, STIGLICH, J.:

In *Lawrence v. Clark County*, we adopted the public trust doctrine, which generally establishes that a state holds its navigable waterways in trust for the public. 127 Nev. 390, 406, 254 P.3d 606, 617 (2011). We are asked for the first time to consider whether the doctrine

---

[1]The Honorable Ron D. Parraguirre, Justice, voluntarily recused himself from participation in the decision of this matter.

permits reallocating water rights previously settled under Nevada's prior appropriation doctrine.

The Ninth Circuit Court of Appeals certified two questions to this court. The first question, as we rephrased it, asks: "Does the public trust doctrine permit reallocating rights already adjudicated and settled under the doctrine of prior appropriation and, if so, to what extent?" The second question asks: "If the public trust doctrine applies and allows for reallocation of rights settled under the doctrine of prior appropriation, does the abrogation of such adjudicated or vested rights constitute a 'taking' under the Nevada Constitution requiring payment of just compensation?"

We conclude that the public trust doctrine as implemented through our state's comprehensive water statutes does not permit the reallocation of water rights already adjudicated and settled under the doctrine of prior appropriation. In doing so, we reaffirm that the public trust doctrine applies in Nevada and clarify that the doctrine applies to all waters within the state, including those previously allocated under prior appropriation. We further hold that the state's statutory water scheme is consistent with the public trust doctrine by requiring the State Engineer to consider the public interest when allocating and administering water rights. But in recognizing the significance of finality in water rights, our Legislature has expressly prohibited reallocating adjudicated water rights that have not been otherwise abandoned or forfeited in accordance with the state's water statutes. Accordingly, we answer the first question as reworded in the negative, and we need not consider the second.

## FACTS AND PROCEDURAL HISTORY[2]

The current litigation arises from appellant Mineral County's intervention in long-running litigation over the water rights in the Walker River Basin to protect and restore Walker Lake.

*Walker River Basin and Walker Lake's decline*

The Walker River Basin covers about 4,000 square miles, stretching northeast from its origins in the Sierra Nevada mountain range in California to its terminus, Walker Lake in Nevada. Approximately one quarter of the Basin lies in California, and California accounts for a majority of the precipitation and surface water flow into the Basin. The vast majority of the water is consumed and lost through evaporation across the border in Nevada.

Walker Lake is approximately 13 miles long, 5 miles wide, and 90 feet deep. However, its size and volume have shrunk significantly since they were first measured in 1882. By 1996, Walker Lake retained just 50 percent of its 1882 surface area and 28 percent of its 1882 volume. Today, Walker Lake suffers from high concentrations of total dissolved solids, such that it has high salt content, low oxygen content, and high temperatures. While the cause of the decline is attributable to multiple factors, including declining precipitation levels and natural lake recession over time, it is clear that upstream appropriations play at least some role. The decline of Walker Lake, according to appellants, has threatened the shelter of migratory birds

---

[2]The following facts are from the Ninth Circuit's certification order, given that this court's review is limited to those facts. *See In re Fontainebleau Las Vegas Holdings*, 128 Nev. 556, 570, 289 P.3d 1199, 1207 (2012).

SUPREME COURT
OF
NEVADA

(O) 1947A

and proven inhospitable to fish species such that much of the lake's fishing industry has been eliminated.

*Litigation over water rights in Walker River Basin*

Litigation over the Walker River Basin began in 1902 when a cattle and land company sued another to enjoin it from interfering with the company's use of the Walker River in Nevada. *See Rickey Land & Cattle Co. v. Miller & Lux*, 218 U.S. 258 (1910). That litigation ended in 1919 with a final decree from the United States District Court for the District of Nevada. *See Mineral Cty. v. State, Dep't of Conservation & Nat. Res.*, 117 Nev. 235, 240, 20 P.3d 800, 803 (2001).

In 1924, the United States brought a case in the United States District Court for the District of Nevada to establish water rights for the Walker Lake Paiute Tribe (the Tribe). The case resulted in the Walker River Decree (the Decree) in 1936, which adjudicated the water rights of various claimants under the doctrine of prior appropriation. *See United States v. Walker River Irrigation Dist.*, 14 F. Supp. 10, 11 (D. Nev. 1936). The Decree also created the Walker River Commission and the United States Board of Water Commissioners. *See Mineral Cty.*, 117 Nev. at 240, 20 P.3d at 804. The United States District Court for the District of Nevada has maintained jurisdiction over the Decree since.

In 1987, the Tribe intervened in this litigation to establish procedures to change allocations of water rights subject to the Decree. That motion was granted, and since then, the Nevada State Engineer reviews all change applications under the Decree in Nevada in accordance with the state's water statutes, subject to the federal district court's review. In 1991, the Tribe sought recognition of additional water rights under the implied federal reserved water right.

*Mineral County's intervention*

In 1994, Mineral County moved to intervene to modify the Decree to ensure minimum flows into Walker Lake. It noted the decline of Walker Lake and its impact on Mineral County's economy. The amended complaint sought an allocation of minimum flows of 127,000 acre/feet per year to Walker Lake under the "doctrine of maintenance of the public trust." The United States District Court for the District of Nevada granted Mineral County's intervention in 2013.[3] Appellant Walker Lake Working Group also supports Mineral County's position but was a defendant in the lower court case as a rights holder under the Decree.

In 2015, the United States District Court for the District of Nevada dismissed Mineral County's amended complaint in intervention, concluding that (1) Mineral County lacked standing to assert a *parens patriae* theory; (2) the public trust doctrine could only prospectively prevent granting appropriative rights, and any retroactive application of the public trust doctrine would constitute a taking requiring just compensation; (3) under the political question doctrine, the court lacked authority to effectuate a taking; and (4) Walker Lake is not part of the Walker River Basin.

Mineral County and the Walker Lake Working Group appealed to the Ninth Circuit Court of Appeals. The Ninth Circuit determined that

---

[3]During the pendency of the motion for intervention, appellants filed a writ petition with this court seeking to enjoin the State and the Department of Conservation and Natural Resources from granting additional water rights from Walker River and challenging their previous allocations as violations of the public trust. We dismissed the writ petition because the United States District Court for the District of Nevada was the proper forum as the decree court monitoring Walker River. *See Mineral Cty.*, 117 Nev. at 245-46, 20 P.3d at 807.

Mineral County had standing to assert its public trust claim. In a concurrent case, it determined that Walker Lake is within the Walker River Basin. *United States v. U.S. Bd. of Water Comm'rs*, 893 F.3d 578, 605-06 (9th Cir. 2018). However, whether Mineral County could seek minimum flows depended on whether the public trust doctrine permits reallocating rights previously settled under prior appropriation. The Ninth Circuit certified two questions to our court, and we accepted both questions.

## DISCUSSION

In determining whether the public trust doctrine permits reallocating rights adjudicated and settled under the doctrine of prior appropriation, we first discuss the tenets of each doctrine. We then discuss Nevada's statutory water scheme, which we conclude already embraces both of these doctrines.

### Prior appropriation doctrine in Nevada

Like most western states, Nevada is a prior appropriation state. The prior appropriation doctrine grants "[a]n appropriative right [that] 'may be described as a state administrative grant that allows the use of a specific quantity of water for a specific beneficial purpose if water is available in the source free from the claims of others with earlier appropriations.'" *Desert Irrigation, Ltd. v. State*, 113 Nev. 1049, 1051 n.1, 944 P.2d 835, 837 n.1 (1997) (quoting Frank J. Trelease & George A. Gould, *Water Law Cases and Materials* 13 (4th ed. 1986)). In *Lobdell v. Simpson*, 2 Nev. 274, 279 (1866), we formally recognized the prior appropriation doctrine in Nevada. Decades later, we affirmed that the doctrine of prior appropriation was the prevailing doctrine in Nevada. *Reno Smelting, Milling & Reduction Works v. Stevenson*, 20 Nev. 269, 282, 21 P. 317, 322 (1889); *see also Jones v. Adams*, 19 Nev. 78, 84-86, 6 P. 442, 445-46 (1885)

Supreme Court
of
Nevada

(O) 1947A

(noting that the common-law doctrine of riparian rights was not suitable for the conditions in Nevada).

*The public trust doctrine in Nevada*

The public trust doctrine establishes that the state holds its navigable waterways and lands thereunder in trust for the public. *See Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 452 (1892). The doctrine generally acts as a restraint on the state in alienating public trust resources. *Id.* at 453. It is an ancient principle originating from Roman law, which provided that "[b]y the law of nature these things are common to mankind—the air, running water, the sea, and consequently the shores of the sea." *The Institutes of Justinian*, Lib. II, Tit. I, § 1, at 158 (Thomas Collett Sandars trans., Callaghan & Co., 1st Am. ed. 1876). From this origin, it was adopted by the common-law courts of England. *See Shively v. Bowlby*, 152 U.S. 1, 11 (1894) ("By the common law, both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King.").

The public trust doctrine was first recognized in the United States in *Martin v. Waddell*, 41 U.S. 367 (1842). In *Martin*, the United States Supreme Court noted that "when the [r]evolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them, for their own common use . . . ." *Id.* at 410. Then in the seminal case of *Illinois Central Railroad*, the United States Supreme Court explained that when states were admitted into the United States on an "equal footing" with the original states, they were granted title to the navigable waters and the lands covered by those waters. 146 U.S. at 434-35. The states thus held title to these areas "in trust for the people of the State" to be enjoyed for

navigation, fishing, and commerce freed from the obstruction of private parties. *Id.* at 452.

Nevada has historically embraced public trust principles. In *State Engineer v. Cowles Brothers, Inc.*, we recognized that "[w]hen a territory is endowed with statehood one of the many items its sovereignty includes is the grant from the federal government of all navigable bodies of water within the particular territory, whether they be rivers, lakes or streams." 86 Nev. 872, 874, 478 P.2d 159, 160 (1970). In *State v. Bunkowski*, we reaffirmed the principles of state ownership of navigable waters and the beds underneath in determining that the Carson River was "navigable" and therefore belonged to the State in trust for public use. 88 Nev. 623, 633-34, 503 P.2d 1231, 1237 (1972). In a concurrence in *Mineral County v. State, Department of Conservation*, Justice Rose eloquently explained the role of the public trust doctrine in Nevada water law:

> This court has itself recognized that this public ownership of water is the "most fundamental tenet of Nevada water law." Additionally, we have noted that those holding vested water rights do not own or acquire title to water, but merely enjoy a right to the beneficial use of the water. This right, however, is forever subject to the public trust, which at all times "forms the outer boundaries of permissible government action with respect to public trust resources." In this manner, then, the public trust doctrine operates simultaneously with the system of prior appropriation.

117 Nev. at 247, 20 P.3d at 808 (Rose, J., concurring) (internal footnotes omitted) (internal citations omitted).

Ten years later, in *Lawrence v. Clark County*, we expressly adopted the public trust doctrine in Nevada. 127 Nev. 390, 406, 254 P.3d 606, 617 (2011). In doing so, we explained that sources of Nevada's public

trust doctrine derived not only from common law, but from Nevada's Constitution, its statutes, and the inherent limitations on the state's sovereignty. *Id.* at 398, 254 P.3d at 612.

Particularly, Article 8, Section 9 of the Nevada Constitution, the gift clause, provides that "[t]he State shall not donate or loan money, or its credit, subscribe to or be, interested in the Stock of any company, association, or corporation, except corporations formed for educational or charitable purposes." We noted that this clause limits the Legislature's ability to dispose of the public's resources, "at the core of which lays the principle that the state acts only as a fiduciary for the public when disposing of the public's valuable property." *Lawrence*, 127 Nev. at 399, 254 P.3d at 612. "[T]he public trust doctrine, like the gift clause, requires the state to serve as trustee for public resources." *Id.*

Moreover, we noted that the Legislature effectively codified the principles behind the public trust doctrine through NRS 321.0005 and NRS 533.025. Specifically, the Legislature has declared that state lands "must be used in the best interest of the residents of this State, and to that end the lands may be used for recreational activities, the production of revenue and other public purposes." NRS 321.0005(1). Regarding water, the Legislature has declared that "[t]he water of all sources of water supply within the boundaries of the State whether above or beneath the surface of the ground, belongs to the public." NRS 533.025. Thus, "[b]oth provisions recognize that the public land and water of this state do not belong to the state to use for any purpose, but only for those purposes that comport with the public's interest in the particular property, exemplifying the fiduciary principles at the heart of the public trust doctrine." *Lawrence*, 127 Nev. at 400, 254 P.3d at 613.

Finally, we noted that the public trust doctrine also derives from inherent limitations on a state's sovereign powers, as recognized by the United States Supreme Court in *Illinois Central Railroad* in establishing that:

> The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties . . . than it can abdicate its police powers in the administration of government and the preservation of the peace.

146 U.S. at 453. Thus, in *Lawrence*, we explained that "because the state holds such property in trust for the public's use, the state is simply without power to dispose of public trust property when it is not in the public's interest." 127 Nev. at 400, 254 P.3d at 613.

While we note that the parties here do not dispute whether the public trust doctrine applies in Nevada, they dispute (1) whether such doctrine applies to rights already adjudicated and settled under the doctrine of prior appropriation, and (2) whether such doctrine applies to nonnavigable waters, navigable waters only, or no water at all.

*The public trust doctrine applies to rights already adjudicated and settled under the doctrine of prior appropriation*

Appellants ask this court to explicitly recognize that the public trust doctrine applies to rights already adjudicated and settled under the doctrine of prior appropriation, such that the doctrine has always inhered in the water law of Nevada as a qualification or constraint in every appropriated right. We explicitly recognize so.

Since our state's admission to the Union, the state's constitution and inherent limitations on state sovereignty have restricted the state's ability to dispose of public trust resources such as navigable

waters and the lands thereunder. *See* Nev. Const. art. 8, § 9; *Ill. Cent. R.R.*, 146 U.S. at 453. Thus, when the state declared that all water within the state belonged to the public, all waters, whether navigable or nonnavigable, within the state were subject to this limitation on the state's discretion to dispose of public trust resources. *Cf.* NRS 533.025. These inherent limitations applied prior to our court's express adoption of the doctrine in *Lawrence*. The public trust doctrine therefore applies to water rights allocated before and subsequent to our opinion in *Lawrence*.

*The public trust doctrine applies to all waters within the state, whether navigable or nonnavigable*

Appellants and their amici ask this court to recognize that the public trust doctrine encompasses nonnavigable waters, while respondents and their amici argue, alternatively, that the doctrine either applies only to navigable waters or no water at all. Given the confusion over the *res* of the public trust doctrine, we clarify that the public trust doctrine applies to all waters of the state, whether navigable or nonnavigable, and to the lands underneath navigable waters.[4] *See id.* To limit the public trust doctrine to only navigable waterways and the lands below would ignore the fact that flowing water that feeds into the navigable waters is allocated along the way. As stated by Justice Rose,

> [A]lthough the original scope of the public trust reached only navigable water, the trust has evolved

---

[4]The dissent errs in contending that this clarification unnecessarily expands the scope of the public trust doctrine. The Legislature recognized that "[t]he water of all sources" is subject to the public trust doctrine. *See* NRS 533.025. The waters of the Basin include nonnavigable tributaries that feed into the navigable Walker Lake, and, as the dissent recognizes, nonnavigable tributaries feeding navigable waters must fall within the scope of the doctrine to prevent the harm of their diversion. Moreover, the parties dispute the scope of the doctrine, warranting this clarification.

to encompass non-navigable tributaries that feed navigable bodies of water. This extension of the doctrine is natural and necessary where, as here, the navigable water's existence is wholly dependent on tributaries that appear to be over-appropriated.

*Mineral Cty.*, 117 Nev. at 247, 20 P.3d at 807-08 (Rose, J., concurring) (internal footnote omitted). To permit the state, as owner of all water within its borders, to freely allocate nonnavigable waters to the detriment of navigable waters held for the public trust would permit the state to evade its fiduciary duties regarding public trust property. This, the state cannot do.

We therefore reaffirm that the public trust doctrine applies in Nevada. We also clarify that it applies to rights previously settled under prior appropriation and clarify that the doctrine applies to all waters in the state and the lands submerged beneath navigable waters.

*Nevada's water statutes are consistent with the public trust doctrine*

Although we recognize that the public trust doctrine applies to prior appropriated rights and that the doctrine has always inhered in Nevada's water law, we hold that Nevada's comprehensive water statutes are already consistent with the public trust doctrine because they (1) constrain water allocations based on the public interest and (2) satisfy all of the elements of the dispensation of public trust property that we established in *Lawrence*. *See* 127 Nev. at 405, 254 P.3d at 616.

*Nevada's statutes regulating water use require the State Engineer to consider the public interest in allocating water rights*

The Legislature has established a comprehensive statutory scheme regulating the procedures for acquiring, changing, and losing water rights in Nevada. Much of Nevada's water laws were rewritten and codified in 1913, bringing all of the state's surface waters and artesian groundwater

under state ownership and regulation by the State Engineer.[5] 1913 Nev. Stat., ch. 140, §§ 1, 18, 20, at 192, 195, 196. In bringing all of the state's water under comprehensive regulation, the Legislature declared that "[t]he water of all sources of water supply within the boundaries of the State whether above or beneath the surface of the ground, belongs to the public." NRS 533.025.

Nevada's water statutes embrace prior appropriation as a fundamental principle. Water rights are given "subject to existing rights," NRS 533.430(1), given dates of priority, NRS 533.265(2)(b), and determined based on relative rights, NRS 533.090(1)-(2).

The other fundamental principle that the water statutes embrace is beneficial use. Specifically, "[b]eneficial use shall be the basis, the measure and the limit of the right to the use of water." NRS 533.035; *see also* NRS 533.030(1) (providing that "all water may be appropriated for beneficial use" subject to existing rights and other limitations provided in the water statutory scheme). Beneficial use is declared "a public use," NRS 533.050, and by statute includes uses such as irrigation, power, municipal supply, domestic use, mining, livestock watering, and storage, NRS 533.340. In 1969, "any recreational purpose," which includes fishing and wildlife habitations, was additionally deemed a beneficial use. NRS 533.030(2); *see* 1969 Nev. Stat., ch. 111, § 1, at 141 (amending NRS 533.030); *State v. Morros*, 104 Nev. 709, 716-17, 766 P.2d 263, 268 (1988) (citing Hearing on A.B. 278 Before the Senate Federal, State & Local Governments Comm., 55th Leg. Sess. (Nev., March 7, 1969)). NRS 533.023 was added in

---

[5]The State Engineer was then granted jurisdiction over all underground waters in the state in 1939. 1939 Nev. Stat., ch. 178, § 1, at 274.

1989 to define "[w]ildlife purposes" to include "the watering of wildlife and the establishment and maintenance of wetlands, fisheries and other wildlife habitats." *See* 1989 Nev. Stat., ch. 741, § 1, at 1733. Accordingly, beneficial use underpins Nevada's water statutes, and the Legislature has continued to delineate and expand on which uses are considered public uses in Nevada.

To ensure that water is being used beneficially and for public use, Nevada's water law charges the State Engineer with approving and rejecting applications. *See* NRS 533.325 (requiring that anyone who wishes to appropriate water or change its diversion apply to the State Engineer for a permit). The State Engineer has identified 13 guidelines, including beneficial use, in determining what constitutes the public interest. *See Pyramid Lake Paiute Tribe of Indians v. Washoe Cty.*, 112 Nev. 743, 746-47, 918 P.2d 697, 698-99 (1996). In considering whether to approve or reject applications, the State Engineer must consider whether the proposed action is "environmentally sound" and "an appropriate long-term use which will not unduly limit the future growth and development in the basin" for groundwater applications, NRS 533.370(3)(c)-(d), and must reject any permit applications detrimental to the public interest, NRS 533.370(2). In these ways, Nevada's water statutes constrain water allocations to those that are public uses and require the State Engineer to reject permits if they are unnecessary or detrimental to the public interest. These considerations are consistent with the public trust doctrine.

Appellants argue, however, that the statutory scheme does not ensure that the state is fulfilling its continuous public trust duties. They maintain that the statutory scheme does not place an affirmative fiduciary

duty on the state to assure that public trust resources are available for future generations. We disagree.

First, the statutes constrain water usage to uses that are necessary and terminate water rights when water is not used beneficially, thereby ensuring against waste. *See* NRS 533.045 ("When the necessity for the use of water does not exist, the right to divert it ceases, and no person shall be permitted to divert or use the waters of this State except at such times as the water is required for a beneficial purpose."); NRS 533.060(1) ("Rights to the use of water must be limited and restricted to as much as may be necessary, when reasonably and economically used for irrigation and other beneficial purposes . . . . The balance of the water not so appropriated must be allowed to flow in the natural stream . . . and must not be considered as having been appropriated thereby."); NRS 534.090 (recognizing forfeiture for nonuse of groundwater for five consecutive years). Second, the statute recognizes that water rights may be abandoned. *See* NRS 533.060 (regarding surface water rights); NRS 534.090 (regarding groundwater rights). Finally, the State Engineer is permitted to declare preferred uses and regulate groundwater in the interest of public welfare, which includes curtailing groundwater rights during water supply shortages. NRS 534.120. In these ways, Nevada's water statutes protect against wasteful use and incorporate mechanisms for limiting water rights when water resources are depleted. The statutory scheme therefore sufficiently places an affirmative duty on the State Engineer to maintain public trust resources.[6]

---

[6]Insofar as the dissent contends that our opinion provides no remedy should the State Engineer abuse its office or misallocate public resources, it

*Nevada's water statutes satisfy Lawrence*

In *Lawrence*, we adopted a three-part test to determine whether the dispensation of public trust property is valid. 127 Nev. at 405, 254 P.3d at 616. Specifically, we stated that courts must consider "(1) whether the dispensation was made for a public purpose, (2) whether the state received fair consideration in exchange for the dispensation, and (3) whether the dispensation satisfies 'the state's special obligation to maintain the trust for the use and enjoyment of present and future generations.'" *Id.* (quoting *Ariz. Ctr. for Law v. Hassell*, 837 P.2d 158, 170 (Ariz. Ct. App. 1991)). In considering the third prong, courts must evaluate the following factors:

> [T]he degree of effect of the project on public trust uses, navigation, fishing, recreation and commerce; the impact of the individual project on the public trust resource; the impact of the individual project when examined cumulatively with existing impediments to full use of the public trust resource . . . ; the impact of the project on the public trust resource when that resource is examined in light of the primary purpose for which the resource is suited, *i.e.* commerce, navigation, fishing or recreation; and the degree to which broad public uses are set aside in favor of more limited or private ones.

*Id.* at 406, 254 P.3d at 616 (alteration in original) (internal quotation marks omitted). Furthermore, "when the Legislature has found that a given

---

is mistaken. The certified questions do not ask the court to settle the matter of judicial review of the State Engineer's actions, and we reject any contention that such actions are per se exempt from judicial review. *See, e.g.*, NRS 533.450 (providing for judicial review of State Engineer orders and decisions); *Pyramid Lake Paiute Tribe of Indians*, 112 Nev. at 762, 918 P.2d at 709 (Springer, J., dissenting) (reasoning that the State Engineer erred in failing to adequately consider the public trust in the allocated resource).

dispensation is in the public's interest, it will be afforded deference." *Id.* at 406, 254 P.3d at 617. Hence, public interest and benefit remain paramount.

Respondents argue that Nevada's statutory water scheme satisfies the requirements to transfer public trust property under *Lawrence*, and we agree. First, the statutes permit the State Engineer only to grant permits that are based on beneficial use, which the Legislature has declared a public use. *See* NRS 533.035; NRS 533.050. Water allocations under the statutes are thus dispensed only for a public purpose. *See Lawrence*, 127 Nev. at 405, 254 P.3d at 616.

Second, the state receives fair consideration in allocating water for beneficial use, satisfying *Lawrence*'s second requirement. *See id.* When water is allocated for purposes such as irrigation, power, municipal supply, mining, storage, or recreation, residents in the state are able to grow or purchase food and receive drinking water, electricity, and other resources. Farmers and miners are able to grow their industries, which in turn boosts the state's economy. *See, e.g.*, Nev. Dep't of Agric., *Economic Analysis of the Food and Agriculture Sector in Nevada 2019*, at 3 (2018) (noting that "Nevada's food [and] agriculture sector contributed $1.3 billion to the state's economy in 2017"); Nev. Dep't of Taxation, Div. of Local Gov't Servs., *2018-2019 Net Proceeds of Minerals Bulletin* 9 (2019) (indicating that Nevada's mining industry contributed approximately $55.8 million in state taxes in 2018). Nevada's prosperity and progress was dependent on the early mining and agricultural industries, which was contingent on the allocation of water based on beneficial use. *See, e.g.*, *In re Manse Spring & Its Tributaries*, 60 Nev. 280, 290, 108 P.2d 311, 316 (1940) ("Courts appreciate the necessity of requiring that water be beneficially used, because of its importance to the agricultural industry of the state."); *Reno Smelting, Milling & Reduction*

*Works*, 20 Nev. at 275, 21 P. at 319 ("And he who first connects his own labor with property thus situated and open to general exploration does, in natural justice, acquire a better right to its use and enjoyment than others who have not given such labor. So the miners on the public lands throughout the pacific states and territories by their customs, usages, and regulations everywhere recognized the inherent justice of this principle . . . ." (internal quotation marks omitted)).

Finally, the dispensation of water under the state's statutory scheme satisfies *Lawrence*'s final requirement that the dispensation "maintain the trust for the use and enjoyment of present and future generations." *See* 127 Nev. at 405, 254 P.3d at 616. As previously discussed, the state's water statutes limit water allocations to those that are put to beneficial use, *see* NRS 533.060, require the State Engineer to reject permits that are unnecessary or detrimental to the public interest, *see* NRS 533.370(2), and limit water rights when water resources are short, abandoned, or being wasted, *see* NRS 534.090; NRS 534.120. Mechanisms are thus in place to ensure the preservation of water for the future. As the state's statutory water scheme reflects *Lawrence*'s requirements, we reject appellants' contention that the statutes effect an abdication of the state's continuous public trust duties.

We therefore hold that Nevada's comprehensive water statutes are consistent with the public trust doctrine.[7]

---

[7]The dissent errs in construing this opinion as holding that relevant provisions in NRS Chapter 533 supplant the public trust doctrine. Rather, the provisions we address here represent the Legislature's efforts to guide the doctrine's application. And as we conclude that they comport with

*The state's water statutes recognize the importance of finality in water rights and therefore do not permit reallocation of adjudicated water rights*

As part of Nevada's comprehensive water statutes, which we conclude adhere to the public trust doctrine, the Legislature enacted NRS 533.185 to establish a judicial decree regarding a water right permit. Regarding those judicial decrees, NRS 533.210(1) provides that:

> The decree entered by the court, as provided by NRS 533.185, *shall be final and shall be conclusive* upon all persons and rights lawfully embraced within the adjudication; but the State Engineer or any party or adjudicated claimant upon any stream or stream system affected by such decree may, at any time within 3 years from the entry thereof, apply to the court for a modification of the decree . . . .

(Emphasis added.) NRS 533.0245 then prohibits the State Engineer from carrying out his or her duty "in a manner that conflicts with any applicable provision of a decree or order issued by a state or federal court."

Respondents argue that the plain language of Nevada's water law statutes prohibit reallocating adjudicated water rights, and we agree. "When the language of a statute is plain and unambiguous, [this] court should give that language its ordinary meaning and not go beyond it." *See City Council of Reno v. Reno Newspapers, Inc.*, 105 Nev. 886, 891, 784 P.2d 974, 977 (1989). NRS 533.210 expressly provides that decreed water rights "shall" be final and conclusive. *See Nat. Res. Def. Council, Inc. v. Perry*, 940

---

*Lawrence*'s test, this opinion retains the distinction between the relevant statutes and the public trust doctrine, with which they must comply.

We caution against the view that an allocation necessarily comports with the public trust doctrine because it meets the statutory requirements. Apart from the statutory scheme, individual dispensations must comport with *Lawrence*'s requirements.

F.3d 1072, 1078 (9th Cir. 2019) ("The word 'will,' like the word 'shall,' is a mandatory term, unless something about the context in which the word is used indicates otherwise." (internal citation omitted)). The statutes also provide an explicit exception wherein a decree could be modified only within three years, NRS 533.210, and the State Engineer is expressly prohibited from allocating water in a manner that conflicts with such finality, NRS 533.0245. The statutory water scheme in Nevada therefore expressly prohibits reallocating adjudicated water rights that have not been abandoned, forfeited, or otherwise lost pursuant to an express statutory provision.

We note that such recognition of finality is vital in arid states like Nevada. In *Arizona v. California*, the United States Supreme Court recognized that "[c]ertainty of rights is particularly important with respect to water rights in the Western United States," and "[t]he doctrine of prior appropriation . . . is itself largely a product of the compelling need for certainty in the holding and use of water rights." 460 U.S. 605, 620 (1983); *see United States v. Alpine Land & Reservoir, Co.*, 984 F.2d 1047, 1050 (9th Cir. 1993) ("Participants in water adjudications are entitled to rely on the finality of decrees as much as, if not more than, parties to other types of civil judgments."). Municipal, social, and economic institutions rely on the finality of water rights for long-term planning and capital investments. Likewise, agricultural and mining industries rely on the finality of water for capital and output, which derivatively impacts other businesses and influences the prosperity of the state. To permit reallocation would create uncertainties for future development in Nevada and undermine the public interest in finality and thus also the management of these resources consistent with the public trust doctrine.

Appellants argue, however, that a right is not exempt from regulation to protect the public welfare simply because it has vested or been adjudicated. Moreover, they argue that water rights are not absolute, but rather relative and usufructuary. We agree that water rights are subject to regulation for the public welfare and are characterized by relative, nonownership rights. *See Desert Irrigation*, 113 Nev. at 1059, 944 P.2d at 842 (recognizing water right as a "inchoate usufructuary right" and that rights holders do not own or acquire title to water); *Town of Eureka v. Office of the State Eng'r*, 108 Nev. 163, 167, 826 P.2d 948, 950 (1992) ("Water rights are subject to regulation under the police power as is necessary for the general welfare."); *In re Manse Spring*, 60 Nev. at 287, 108 P.2d at 315 (noting the state has the right to prescribe how water may be used); *Usufruct, Black's Law Dictionary* (11th ed. 2019) ("A right for a certain period to use and enjoy the fruits of another's property without damaging or diminishing it."). Nonetheless, this does not necessarily mean that water rights can be reallocated under the public trust doctrine. Rather, it means that rights holders must continually use water beneficially or lose those rights. We therefore hold that the public trust doctrine does not permit reallocating water rights already adjudicated and settled under the doctrine of prior appropriation.[8]

---

[8]The dissent mistakenly contends that the matter of reallocation lies beyond the scope of the certified questions and that rephrasing the first question was thus misguided. The underlying dispute involves demands for overappropriated resources that require determining whether water rights may be reallocated from current rights holders. Mineral County sought an annual allocation of minimum flows of 127,000 acre/feet, and, as stated by the Ninth Circuit, its complaint sought to "reopen and modify the final Decree." The Basin does not appear able to meet the county's needs without

Supreme Court
of
Nevada

(O) 1947A

We recognize the tragic decline of Walker Lake.[9]  But while we are sympathetic to the plight of Walker Lake and the resulting negative impacts on the wildlife, resources, and economy in Mineral County, we cannot use the public trust doctrine as a tool to uproot an entire water system, particularly where finality is firmly rooted in our statutes.  We cannot read into the statutes any authority to permit reallocation when the Legislature has already declared that adjudicated water rights are final, nor can we substitute our own policy judgments for the Legislature's.[10]

---

abrogating the rights of more senior right holders.  The county's request would therefore require reallocating water rights.  The Ninth Circuit recognized as much in its Amended Certification Order stating, "[T]he remaining issue—whether the Walker River Decree can be amended to allow for certain minimum flows of water to reach Walker Lake—depends on whether the public trust doctrine applies to rights previously adjudicated and settled under the doctrine of prior appropriation and *permits alteration of prior allocations*." (Emphasis added.) Rephrasing the certified question thus served to "streamline [the questions certified] in order to best resolve the legal issues presented." *In re Fontainebleau Las Vegas Holdings*, 128 Nev. at 571-72, 289 P.3d at 1209.

[9]Mark Twain once observed regarding Walker Lake and other lakes in Nevada, "Water is always flowing into them; none is ever seen to flow out of them, and yet they remain always level full, neither receding nor overflowing."  Mark Twain, *Roughing It*, ch. XX (Project Gutenberg 2006) (ebook) (1872).  Unfortunately, this is no longer the case, and our state's water is now more precious than ever.

[10]While we recognize that the dissent would urge that we adopt a model more freely permitting reconsideration of prior allocations, such as that discussed in *National Audubon Society v. Superior Court*, 658 P.2d 709, 732 (Cal. 1983), we decline to diminish the stability of prior allocations and detract from the simultaneous operation of both prior appropriation and the public trust doctrine, *see Mineral Cty.*, 117 Nev. at 247, 20 P.3d at 808 (Rose, J., concurring).

*Second certified question*

Because we hold that the public trust doctrine does not permit reallocation, we need not address the second certified question, which asks: "If the public trust doctrine applies and allows for reallocation of rights settled under the doctrine of prior appropriation, does the abrogation of such adjudicated or vested rights constitute a 'taking' under the Nevada Constitution requiring payment of just compensation?" Without reallocation, no rights are abrogated and no takings issue is implicated.

## CONCLUSION

Nevada's statutory scheme already incorporates the public trust doctrine, giving force to constitutional and inherent limitations on state sovereignty that protect the public interest in the waters of the state, both navigable or nonnavigable, as well as the lands underneath navigable waters. To allow the state to otherwise allocate waters without due regard for the public trust would permit the state to evade its fiduciary duties, and this we cannot sanction.

In implementing the public trust doctrine, our state's water rights statutes forbid reallocating adjudicated water rights. The public has an interest in the effective use of public trust resources. This requires that allocations of water rights have certainty and finality so that rights holders may effectively direct water usage to its beneficial use, without undue uncertainty or waste. Our state's application of the public trust doctrine thus protects the waters of Nevada in order to maintain them in trust for the use and enjoyment of present and future generations.

In response to the first certified question, as reworded, we answer that the public trust doctrine does not permit reallocating water rights already adjudicated and settled under the doctrine of prior appropriation. Because we answer the first question in the negative, we need not address the second certified question.

_____, J.
Stiglich

We concur:

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Cadish

PICKERING, C.J., with whom SILVER, J., agrees, concurring in part and dissenting in part:

I.

The certified question from the Ninth Circuit is: "Does the public trust doctrine apply to rights already adjudicated and settled under the doctrine of prior appropriation and, if so, to what extent?" Because this court's answer to such a question is only appropriate where it "may be determinative of the cause then pending in the certifying court," NRAP 5, we must accept and address the question in the limited context in which it arises. *See Peone v. Regulus Stud Mills, Inc.*, 744 P.2d 102, 103 (Idaho 1987) (cautioning against deciding extraneous matters that "would result in an advisory opinion on a question not certified"). Here, the question arises from an appeal from a district court order granting a motion to dismiss, on the basis that the public trust doctrine gives Mineral County no claim upon which relief might be granted in respect to its prayer that the Walker River Basin decree court adopt measures to protect Walker Lake water levels. Given this procedural context, the majority opinion should have been limited to addressing whether the public trust doctrine applies to, and to what extent it may be determinative of, Mineral County's request for consideration of the health of Walker Lake in the administration of the waters in the Basin.

Instead, the majority rephrases the Ninth Circuit's question to ask: "Does the public trust doctrine permit reallocating rights already adjudicated and settled under the doctrine of prior appropriation and, if so, to what extent?" Majority op. at 5. Thus rephrased, the question effectively asks whether the public trust doctrine allows the Walker River Decree Court to revoke senior adjudicated upstream rights. But, as Mineral

County argues, it does not seek creation of a super-senior water right to override those already adjudicated and settled in the underlying case. Rather, consistent with the relevant procedural posture, Mineral County seeks a range of relief aimed at facilitating the Walker River Decree Court's fulfillment of this state's public trust duty with respect to the precious natural resource that is Walker Lake. As Mineral County explains, an order granting it the relief sought in its complaint-in-intervention could take a number of different forms.

> Such an order might involve, without limitation: (1) a change in how surplus waters are managed in wet years and how flows outside of the irrigation season are managed; (2) mandating efficiency improvements with a requirement that water saved thereby be released to [Walker Lake]; (3) curtailment of the most speculative junior rights on the system; (4) a mandate that the State provide both a plan for fulfilling its public trust duty to Walker Lake and the funding necessary to effectuate that plan; and/or (5) an order requiring water rights holders to come up with a plan to reduce consumptive water use in the Basin as was done by the [State Engineer] in Diamond Valley.

Mineral County further represents that the Walker Basin Restoration Program (WBRP) has acquired by purchase half of the water rights needed to fulfill Walker Lake's demand, but that WBRP is facing obstruction by the federal water master and exorbitant charges, such that not one drop of the purchased water has reached Walker Lake. If proven, these allegations—which we should assume are true for purposes of answering the Ninth Circuit's certified question, *see Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012) (in reviewing an order granting a motion to dismiss, the Ninth Circuit accepts "all factual allegations in the complaint as true")—support directives by the Walker

River Decree Court to the water master to facilitate delivery to Walker Lake of the water purchased for it without further delay and expense.

Notably, none of these remedial measures would require a "reallocation of rights," as framed by the majority. And thus, as a threshold matter, I cannot agree that NRAP 5 authorizes the court to rephrase and then answer a question the underlying case does not present—the revocation of vested water rights is not at issue, and this court need not answer whether the public trust doctrine can effect the same.

## II.

But there is another, more substantive problem with the revised question the majority asks itself: As revised, the question suggests an all-or-nothing approach that is fundamentally inconsistent with the public trust doctrine. Nevada's appropriative water rights system and the public trust doctrine developed independently of each other. The goal is to balance them and their competing values, not set them on a collision course.

> [B]oth the public trust doctrine and the [prior appropriation] system embody important precepts which make the law more responsive to the diverse needs and interests involved in the planning and allocation of water resources. To embrace one system of thought and reject the other would lead to an unbalanced structure, one which would either decry as a breach of trust appropriations essential to the economic development of this state, or deny any duty to protect or even consider the values promoted by the public trust.

*Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709, 723-24 (Cal. 1983). Just as the system of prior appropriation "may be necessary for efficient use of water despite unavoidable harm to public trust values, . . . an appropriative water rights system administered without consideration of the public trust may cause unnecessary and unjustified harm to trust

interests." *Id.* at 728. The rephrased question misdirects the analysis, because it excludes the balancing that lies at the heart of the public trust doctrine.

A.

I begin with the points on which the majority and I agree—this court has previously made plain that the public trust doctrine inheres in Nevada law. *Lawrence v. Clark Cty.*, 127 Nev. 390, 398, 254 P.3d 606, 612 (2011); *see Mineral Cty. v. State, Dep't of Conservation & Nat. Res.*, 117 Nev. 235, 247, 20 P.3d 800, 808 (2001) (Rose, J., concurring). The doctrine stems from "the most fundamental tenet of Nevada water law," *Desert Irrigation, Ltd. v. State*, 113 Nev. 1049, 1059, 944 P.2d 835, 842 (1997)—that is, public ownership of this state's water sources—because, necessarily correspondent to this public ownership is the state's fiduciary obligation "to protect the people's common heritage of streams, lakes, marshlands and tidelands," *Kootenai Envtl. All., Inc. v. Panhandle Yacht Club, Inc.*, 671 P.2d 1085, 1094 (Idaho 1983) (quoting *Audubon*, 658 P.2d at 723-24); *see also Farm Inv. Co. v. Carpenter*, 61 P. 258, 265 (Wyo. 1900) ("There is to be observed no appreciable distinction, under the doctrine of prior appropriation, between a declaration that the water is the property of the public, and that it is the property of the state."). I likewise concur with the majority that these doctrinal principles are founded in Nevada's Constitution and "inherent from inseverable restraints on the state's sovereign power." *Lawrence*, 127 Nev. at 398, 254 P.3d at 612; majority op. at 26.

But from there the majority and I part company. Citing Justice Rose's limited statement that the public trust encompasses both navigable water and "non-navigable tributaries that feed navigable bodies of water," *Mineral Cty.*, 117 Nev. at 247, 20 P.3d at 807-08 (Rose, J., concurring) (citing

*Audubon*, 658 P.2d at 721) (concluding that "the public trust doctrine . . . protects navigable waters from harm caused by diversion of nonnavigable tributaries"), the majority proceeds to "*clarify* that the public trust doctrine applies to *all waters of the state, whether navigable or nonnavigable*, and to the lands underneath navigable waters." Majority op. at 14 & n.4 (emphases added). This "clarification" marks a significant expansion of the public trust doctrine—one that increases the conflict the majority posits between the public trust doctrine and Nevada's prior appropriation system. While the principle is consistent with doctrine emerging in a few jurisdictions, *see In re Water Use Permit Applications*, 9 P.3d 409, 445 (Haw. 2000) (holding that the "public trust doctrine applies to all water resources without exception or distinction"); *Parks v. Cooper*, 676 N.W.2d 823, 839 (S.D. 2004) (holding that "all waters within South Dakota, not just those waters considered navigable under the federal test, are held in trust by the State for the public"), it is not universally adopted, *see, e.g., Audubon*, 658 P.2d at 721 n.19; *Parks*, 676 N.W.2d at 839-41 (collecting cases). *See also* Joseph Regalia, *A New Water Law Vista: Rooting the Public Trust Doctrine in the Courts*, 108 Ky. L.J. 1, 14 (2020) (discussing variability among western states with regard to waters covered by the public trust doctrine). But here, the question of expanding the public trust doctrine to reach all water without regard to navigability is not presented: No one disputes, for purposes of deciding the certified questions in this case, that Walker River and Walker Lake encompass navigable waters, fed by nonnavigable surface tributaries. We could meaningfully answer the ultimate question—even as framed by the majority—by simply assuming the navigability of waters in the Basin for purposes of traditional public trust doctrine analysis. *Figueroa-Beltran v. United States*, 136 Nev., Adv.

SUPREME COURT
OF
NEVADA

(O) 1947A

Op. 45, 467 P.3d 615 (2020) (noting that when deciding certified questions, the court "accept[s] the facts as stated in the certification order and its attachments") (quoting *Progressive Gulf Ins. Co. v. Faehnrich*, 130 Nev. 167, 170, 327 P.3d 1061, 1063 (2014)); *see Audubon*, 658 P.2d at 721 n.19 (declining to "consider the question whether the public trust extends for some purposes—such as protection of fishing, environmental values, and recreation interests—to nonnavigable streams" where the facts did not require it to do so).

## B.

Having recast the certified question, and then expanded the reach of the public trust doctrine beyond the call of that question to reach all waters, even groundwaters not connected to navigable waterways, the majority then subsumes the public trust doctrine in a handful of sections in NRS Chapter 533. Majority op. at 21 & n.7. According to the majority, and based on those sections, the Legislature has reposed in the State Engineer the entirety of this state's fiduciary duties to protect and conserve all of Nevada's water sources under the public trust doctrine. *Id.* at 17-18. And under such an approach, so long as the State Engineer executes his discretionary statutory obligations under NRS Chapter 533, *see Wilson v. Happy Creek, Inc.*, 135 Nev. 301, 308, 448 P.3d 1106, 1112 (2019) (noting generally that the State Engineer's discretionary decisions are reviewed deferentially), there is no remedy or action to be taken to protect from the irreversible depletion of this state's most precious natural resource. But this view fundamentally misapprehends the public trust doctrine and its constitutional and sovereign dimensions. *See* Regalia, 108 Ky. L.J. at 20 (noting that the doctrine "is emblematic of fundamental constitutional principles embedded in American democracy").

To begin, the Nevada Constitution expressly limits the Legislature's ability to freely dispose of public resources. *See* Nev. Const. art. 8, § 9 (prohibiting the gift or loan of public property). And this court has made plain that any legislative action that purports to convey property held in trust for the public is therefore subject to judicial review. *Lawrence*, 127 Nev. at 399-401, 254 P.3d at 612-13 (citing *San Carlos Apache Tribe v. Superior Court*, 972 P.2d 179, 199 (Ariz. 1999)); *see also Ariz. Ctr. for Law in the Pub. Interest v. Hassell*, 837 P.2d 158, 166-68 (Ariz. Ct. App. 1991). Thus, even assuming that NRS Chapter 533 comports with the public trust doctrine, the doctrine's judicial check would be necessary; the mere existence of water source regulations does not ensure the Legislature's and the State Engineer's compliance with the same. *See Lawrence*, 127 Nev. at 399-401, 254 P.3d at 612-13. Put differently, "[j]ust as private trustees are judicially accountable to their beneficiaries for dispositions of the res, . . . so the legislative and executive branches are judicially accountable for their dispositions of the public trust." *Hassell*, 837 P.2d at 169 (internal citations omitted).

Moreover, it is a well-established principle of separation of powers that a legislature cannot "grant to an officer under its control what it does not possess." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). Accordingly, it cannot be that with the enactment of NRS Chapter 533, the Legislature effectively delegated to an administrative officer its own public trust obligations and the judiciary's responsibility to police constitutional and sovereign limits on the Legislature's own authority. *San Carlos Apache Tribe*, 972 P.2d at 199 (stating that a legislature cannot "by legislation destroy the constitutional limits on its authority" or "order the courts to make the [public trust] doctrine inapplicable to . . . any proceedings"

governing water rights); *Hassell*, 837 P.2d at 166-68 (basing its decision on the separation-of-powers doctrine and a constitutional gift clause nearly identical to Nevada's). As this court stated in *Lawrence*, "[t]he public trust doctrine is . . . not simply common law easily abrogated by legislation." 127 Nev. at 401, 254 P.3d at 613. Rather, it is an "inabrogable attribute of statehood itself." *Hassell*, 837 P.2d at 168; *Ill. Cent. R. Co. v. Illinois*, 146 U.S. 387, 453 (1892) (noting that a state cannot abdicate its duties under the public trust doctrine).

The majority does not tackle these principles head-on, instead attempting a sleight of hand. NRS Chapter 533, the majority argues, has functionally replaced the public trust doctrine because its provisions are "consistent with" the public trust doctrine and "satisfy all of the elements of the dispensation of public trust property that we established in *Lawrence*." Majority op. at 15. The majority further attempts to misdirect that the values the public trust doctrine protects are totally commensurate with the "public interest" as considered in NRS Chapter 533. *See id.* at 21 n.7. In so doing, the majority equates the concepts in error—an appropriation could conceivably be in the public interest while still resulting in unavoidable and unjustified harm to public trust values. *See Audubon*, 658 P.2d at 728. For example, while it could theoretically be in the public interest to allocate water rights to facilitate cattle grazing, increase herd size, and ultimately reduce the price of beef for dinner, if done without regard to the deleterious impacts of unsustainable watering and grazing on Nevada's natural resources, such action could also be entirely inconsistent with public trust principles.

In any case, while it is true that the cited water statutes and public trust doctrine may share and even promote the same core principles, this shared purpose alone "do[es] not override the public trust doctrine or render it superfluous." *Water Use Permit Applications*, 9 P.3d at 445. To the contrary, the public trust doctrine, enforced by a separate and independent judiciary, is one intentionally endowed with flexibility—to consider a multitude of needs and impacts, to encompass more and different protections over this state's water sources, to check the actions by legislative and executive actors for absolute compliance with their fiduciary obligations—that those limited statutory sections cited lack. *See Kootenai*, 671 P.2d at 1095 (noting that "mere compliance by [the State Engineer] with [its] legislative authority is not sufficient to determine if [its] actions comport with the requirements of the public trust doctrine"); *see also* Rebecca LaGrandeur Harms, *Preserving the Common Law Public Trust Doctrine: Maintaining Flexibility in an Era of Increasing Statutes*, 39 Environs: Envtl. L. & Pol'y J., 97, 113 (2015) (recognizing the "unique utility of the public trust doctrine in its original common law form"—"common law doctrine has been able to expand to cover more natural resources and public uses").

Perhaps even more concerning is that the rigid statutory protections the majority would endow with sovereign state functions can be repealed, *see Audubon*, 658 P.2d at 728 n.27 (noting same concern); what of this storied doctrine then? I cannot fathom relocating this long-standing limitation on sovereign authority, *see* Regalia, 108 Ky. L.J. at 28 (discussing purpose of doctrine), to such shaky ground. No doubt the public trust doctrine may "inform [the] interpretation [of NRS Chapter 533], define its permissible 'outer limits,' and justify its existence." *Water Use Permit*

*Applications*, 9 P.3d at 445. But it cannot be that this state's affirmative fiduciary obligations over certain water sources—obligations supervised by the judiciary and founded on a century of common law, inherent sovereign authority, and the state constitution—are entirely subsumed by a handful of statutes governing the specific duties of an administrative agent.

Indeed, that the public trust doctrine exists as one part of an integrated system of water law that also includes NRS Chapter 533 is the only logical outcome—as Mineral County stated so aptly in its reply brief, the "[i]nclusion of a provision in statutory law does not ensure execution of that provision in satisfaction of the State's public trust duties." And that principle is well-illustrated here. The public trust doctrine demands that some responsible state entity take action to preserve the public value of Walker Lake, yet all parties recognize its continuing decline despite the State Engineer's statutory obligations. The doctrine does not permit the Walker River Decree Court to simply stand by and watch the ruination of public resources, but what enforcement avenue has the majority left here? Simply put, if the doctrine does not empower the Walker River Decree Court's independent supervision of the State Engineer's management of rights in Basin waters, it is illusory; the majority's recognition of its history and scope, mere lip service.

Unsurprisingly then, and as many cases cited above suggest, courts in other states have held that the public trust doctrine is one part of an integrated system of water laws, which system also includes, in part, a statutory system of appropriative water rights. *See, e.g., Audubon*, 658 P.2d at 732; *Parks v. Cooper*, 676 N.W.2d 823, 838 (S.D. 2004) (aligning South Dakota's jurisprudence with other jurisdictions'). And despite the interconnectedness of the doctrine and appropriative systems, these foreign

courts have still recognized that the public trust doctrine exists "independently of any statutory [water source] protections supplied by the legislature." *See Water Use Permit Applications*, 9 P.3d at 444 (collecting cases); *see also Kootenai*, 671 P.2d at 1094; *Hassell*, 837 P.2d at 168; *Cooper*, 676 N.W.2d at 838 (collecting cases).

This court has repeatedly reaffirmed that Nevada looks to the water law of its western sister states to interpret and understand its own. *See Happy Creek*, 135 Nev. at 304, 448 P.3d at 1109. And indeed, this court reviewed and previously approved of the reasoning in some of those cases cited above. *Mineral Cty.*, 117 Nev. at 247 & nn.4-5, 20 P.3d at 808 & nn.4-5 (Rose, J., concurring) (discussing and favorably citing *Audubon*); *Lawrence*, 127 Nev. at 405-06, 254 P.3d at 616 (favorably citing the reasoning in *Hassell*). This court should not easily set aside such analysis, *Miller v. Burk*, 124 Nev. 579, 597, 188 P.3d 1112, 1124 (2008) (stating that, generally, this court "will not overturn [precedent] absent compelling reasons for so doing"), or the well-reasoned decisions underlying the same. But the majority makes no attempt to explain how the principles enunciated in *Audubon*, *Hassell*, and *Kootenai* have become inapplicable in the years since we first highlighted them, citing *Audubon* and *Hassell* only in passing and omitting any mention of *Kootenai*.

## C.

Setting aside these considerations of sovereign responsibilities, separation of powers, and stare decisis, the majority points to the importance of "finality" in water-rights determinations. In fact, the majority implicitly holds that this principle outweighs every other already mentioned, to require the merger of the public trust doctrine and NRS Chapter 533. The majority relies on a United States Supreme Court

decision involving California and Arizona for its proposition that the necessity of finality of water rights supersedes the effective application of an inseverable constitutional restraint on state power. Majority op. at 23 (quoting *Arizona v. California*, 460 U.S. 605, 620 (1983)). But the precedent of both those states, cited and discussed above, establishes that the public trust doctrine exists independently of their respective state water statutes, and even despite the importance of finality. *Hassell*, 837 P.2d at 169 (noting that "[f]inal determination whether the alienation or impairment of a public trust resource violates the public trust doctrine will be made by the judiciary" (quoting *Kootenai*, 671 P.2d at 1092)); *Audubon*, 658 P.2d at 723 (recognizing the "continuing power of the state as administrator of the public trust, a power which extends to the revocation of previously granted rights or to the enforcement of the trust against lands long thought free of the trust").

The posited dichotomy is thus a false one. Crediting Mineral County's position with respect to the public trust doctrine does not require that the decree court revoke senior adjudicated Walker Basin water rights. It bears repeating: Mineral County names several approaches that would better protect the value of Walker Lake *without disturbing vested rights or impinging on principles of finality*. It is not now this court's responsibility— or the Ninth Circuit's—to determine whether Mineral County can prevail across the board on its claims and obtain all the relief it seeks. *See Skilstaf*, 669 F.3d at 1014 (holding that, in reviewing an appeal from an order granting a motion to dismiss, the reviewing court accepts as true the nonmoving party's allegations). But, if Mineral County can demonstrate that conservation of Walker Lake would be enhanced by using these measures, and that the administration of the Basin contrary to those

objectives contravenes the public trust doctrine, it is entitled to proceed. In any case, and as established, the Walker River Decree Court cannot simply ignore its obligations under the doctrine because in application the facts are complicated. *See Ill. Cent. R.*, 146 U.S. at 453 ("The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters . . . than it can abdicate its police powers in the administration of government and the preservation of the peace.").

Bearing all this in mind, I do not deem trivial the concerns of Basin rights holders regarding finality, or deny that their reliance on prior allocations of Basin waters may be substantial. To the contrary, such concerns should enter into any reexamination of authorized diversions in the Basin undertaken by the Walker River Decree Court according to the public trust doctrine. *See Audubon*, 658 P.2d at 729. But, under our system of water rights, a prior appropriation is never permanent—even vested rights are granted only to the extent their holders do not over-appropriate or waste water. *See Desert Irrigation, Ltd. v. State*, 113 Nev. 1049, 1059, 944 P.2d 835, 842 (1997). Accordingly, the existence of such appropriations cannot be said to entirely preclude the Walker River Decree Court from addressing public trust concerns. *See id.* ("It is clear that some responsible body ought to reconsider the allocation of the waters of the . . . Basin. No vested rights bar such consideration.") (footnote omitted).

### III.

Based on the discussion offered above, I would answer the Ninth Circuit's first question as follows: The public trust doctrine is one part of Nevada's integrated system of water laws, and assuming the truth of the facts presented, the doctrine protects Walker Lake from harm caused by diversions of Basin waters, whatever the cause, and that this interest must

SUPREME COURT
OF
NEVADA

(O) 1947A

be cast into the balance in managing the Walker River Basin, even though doing so may impinge on historical practices in utilizing vested water rights. I recognize that my response to the Ninth Circuit's first question begs an answer to its second question, which the majority declined to answer— namely, "If the public trust doctrine applies and allows for reallocation of rights settled under the doctrine of prior appropriation, does the abrogation of such adjudicated or vested rights constitute a 'taking' under the Nevada Constitution requiring payment of just compensation?"

In *Audubon*, the California Supreme Court offered the definitive discussion of the delicate balance an independently supervised public trust doctrine helps strike in an integrated system of water law. *See Audubon*, 658 P.2d at 727. With regard to the powers of the legislature and authorized executive agency, the California court noted that they necessarily have "the power to grant usufructuary licenses that will permit an appropriator to take water from flowing streams and use that water in a distant part of the state, even though this taking does not promote, and may unavoidably harm, the trust uses at the source stream." *Audubon*, 658 P.2d at 727. Indeed, the court admitted that "[t]he population and economy of [a] state depend upon the appropriation of vast quantities of water for uses unrelated to in-stream trust values." *Id.* But weighing against these economic considerations is the truth, demonstrable even by the precipitous decline of Walker Lake, that "an appropriative water rights system administered without consideration of the public trust may cause unnecessary and unjustified harm to trust interests." *Id.* at 728. Thus, the public trust doctrine requires that the state affirmatively reassess the availability of water resources, as necessary to protect the public interest,

"in light of current knowledge or . . . current needs," *id.*, and demand feasible accommodations as necessary.

In this case, Mineral County represents that the objectives of the public trust reassessment may be achieved in any one of several different ways. But importantly, whatever solution the Walker River Decree Court ultimately adopts, it would not demand the creation of a new and superior water right that would upset the prior "allocation of rights" and require a complete restructuring of Nevada water law, as framed by the majority. As discussed above, the limited factual record before this court indicates that the Basin waters are publicly held navigable or nonnavigable surface water tributaries, such that any holders of usufructuary rights in the waters acquired them subject to the public trust in the first instance. *See Mineral Cty.*, 117 Nev. at 247, 20 P.3d at 808 (Rose, J., concurring); *cf. Desert Irrigation*, 113 Nev. at 1059, 944 P.2d at 842 ("Indeed, even those holding certificated, vested, or perfected water rights do not own or acquire title to water. They merely enjoy the right to beneficial use."). Even the vested water rights at issue are only worth the maximum amount of water available for allocation in the Basin, which water source, according to the record before this court, is held in public trust. Thus, while enforcement of the doctrine could potentially alter the amount of Basin water available for private use—as Mineral County points out, just as "any other natural constraint on the already variable availability of water to supply private appropriations"—it does not effect a reallocation of vested water rights. *Audubon*, 658 P.2d at 723 (stating that "while [a rights holder] may assert a vested right to the servient estate (the right of use subject to the trust) and to any improvements he erects, he can claim no vested right to bar recognition of the trust or state action to carry out its purposes").

SUPREME COURT
OF
NEVADA

(O) 1947A

15

Accordingly, even to the extent the Walker River Decree Court would act to protect Walker Lake pursuant to the doctrine by limiting the availability of Basin waters, it would not divest anyone of any legal title they previously held. *Id.* ("Except for those rare instances in which a grantee may acquire a right to use former trust property free of restrictions, the grantee holds subject to the trust . . . ."); *see also* Michael C. Blumm, *The Public Trust Doctrine and Private Property: The Accommodation Principle*, 27 Pace Envtl. L. Rev. 649, 650-51 (2010) (stating that "[c]ourts applying [this] doctrine demand all feasible accommodations to preserve and protect trust assets, but they do not attempt to eliminate private property. In fact, virtually all applications of the public trust doctrine leave possession of private property unchanged" and collecting cases (internal footnote omitted)).

The answer to the Ninth Circuit's second question then, is that enforcement of the public trust doctrine here does not result in a "reallocation of water rights," much less implicate the constitutional takings doctrine.

\*\*\*

In sum, "[t]he public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state . . . ." *Kootenai*, 671 P.2d at 1094 (quoting *Audubon*, 658 P.2d at 723-24). And, as the majority recognizes, the duty in question arises from constitutional sources and inherent sovereign authority to protect the interests of "present generations [and] those to come." *Hassell*, 837 P.2d at 169. Moreover, "[t]he check and balance of judicial review" are essential components of the state's fiduciary duties, particularly where water resources are concerned, "provid[ing] a level of protection against

SUPREME COURT
OF
NEVADA

(O) 1947A

16

improvident dissipation of an irreplaceable res." *Id.* I therefore cannot agree that the Legislature can implicitly bestow these responsibilities on an executive agent, eliminating any judicial oversight. Even apart from this, Mineral County does not request a "reallocation of rights," only that the existing decree be managed in accordance with long-standing principles.

Accordingly, while I concur in part, I otherwise respectfully dissent.

_____, C.J.
Pickering

I concur:

_____, J.
Silver

Supreme Court
of
Nevada

(O) 1947A